E-FILED
Wednesday, 25 February, 2009  04:04:52 PM
Clerk, U.S. District Court, ILCD

1          MR. PRIOR:  Yeah.

2          MS. FOSTER:  We'll see how far this is.

3          THE COURT:  Court reporter has indicated she --

4    it's not her habit to try to transcribe what's on the tape

5    since we already have a transcription of it.

6          Is that a problem for anybody?

7          MR. PRIOR:  No, your Honor.

8          MS. FOSTER:  No, your Honor.

9          That should be the start of Page 3.

10    (Whereupon People's Exhibit No. 3 was played in open

11                        court).

12          MS. FOSTER:  There's probably an additional 10

13    minutes on the other side.  I don't know if you want to

14    finish it or come back.

15          MR. PRIOR:  I'm flexible.  I'll do whatever.

16          THE COURT:  What's everyone's pleasure?

17          MS. FOSTER:  Doesn't matter to me.  Whatever the

18    Court would like to do.

19          THE COURT:  Are you all right?

20          COURT REPORTER:  Uh-huh.

21          THE COURT:  Let's just finish it.

22    (Whereupon People's Exhibit No. 3 continued to be played in

23                     open court).

24          THE COURT:  There's no transcript of this side?

1          MS. FOSTER:  No.

2     (Whereupon People's Exhibit No. 3 continued to be played in

3                         open court).

4          THE COURT:  All right, that concludes the playing

5     of Exhibit 3.  Given the hour, let's break for lunch.

6          MS. FOSTER:  Okay.

7          THE COURT:  I've got a 1:30 sentencing hearing.  I

8     would not expect that to take very long.  Sometimes they

9     don't get started right away, so why don't we come back at

10    1:30 and see if maybe we can at least conclude your

11    direction examination --

12         MS. FOSTER:  Sure, okay.

13         THE COURT:  -- and then maybe start cross after

14    that sentencing.

15         MR. PRIOR:  Okay.

16         MS. FOSTER:  Okay.

17         THE COURT:  Thank you all.

18         (Whereupon the proceedings recessed.)

19         THE COURT:  We're back on the record in 07 CF 55,

20    People versus Michael Forbes.  Defendant appears with

21    Mr. Prior; the State by Ms. Foster.  Witness, Megan Hunt, is

22    present again and on the witness stand.

23         Matter comes on following a recess for lunch.  Are

24    the parties ready to resume?

58

1      MS. FOSTER:  Yes, your Honor.

2      MR. PRIOR:  Yes, your Honor.

3      THE COURT:  Ms. Foster.

4      MS. FOSTER:  Thank you.

5      Q.   (By Ms. Foster)  Megan, in those two recorded

6   conversations we just listened to, you remember those

7   conversations?

8      A.   I do.

9      Q.   Okay.  And in those conversations, the defendant

10   was very concerned that you not tell anyone, correct?

11      A.   Yes.

12      Q.   Is that the first time he had told you you

13   couldn't tell anyone?

14      A.   No.

15      Q.   When had he first mentioned that you couldn't tell

16   anyone about what was going on?

17      A.   Um, I think the first time he alluded to that was

18   after the party at the Tuba House.  He got an anonymous --

19   what was deemed an anonymous e-mail from another student

20   saying that I was concerned.

21      MR. PRIOR:  Objection, your Honor, hearsay.

22      A.   I have the e-mail.  I guess not here though.

23      MS. FOSTER:  I'll move on.

24      THE COURT:  All right.

59

1      Q.   (By Ms. Foster)  After the incident at the Tuba

2  House, when was the next time you remember the defendant

3  telling you or warning you not to tell anyone?

4      A.   We talked a lot about it when he was in my car

5  that night at Cook.

6      Q.   Okay.  Did he tell you why you couldn't tell

7  anyone?

8      A.   Yes, he did.

9      Q.   And what did he say?

10      A.   There were several different reasons.  He said

11  that he could lose his job.  He said that he could get in

12  all kinds of trouble with the university, not just losing

13  his job but just getting in trouble.  He said that it would

14  cause problems with his wife, and he also referenced Sasha

15  on occasion.

16      Q.   So, the first reason you remember giving you for

17  why you couldn't tell had to do with his job at ISU,

18  correct?

19      A.   Yes.

20      Q.   And how did it make you feel when he was warning

21  you not to tell anyone?

22      A.   Um, at the time I think I felt, um, more isolated

23  than I already did, much more that it just wasn't something

24  that I could talk about with people, you know, even if I

1    felt like I needed to, which I did after the tuba party.  I

2    guess it made me feel bad in the sense that this was

3    happening to Siiri and Siiri didn't know when he would talk

4    about Siiri.  When he would talk about Sasha growing up

5    without a father it was hard, because I grew up without a

6    dad, and it was personally hard for me to hear.  So I think

7    I just felt very intimidated.

8         Q.   And the basis of your relationship, for lack of a

9    better term, or your acquaintanceship with Dr. Forbes, was

10   that based upon his position in the university?

11        A.   Yeah.  I wouldn't have known him unless he was a

12   brass teacher.

13        Q.   And, again, just for clarification, did you make a

14   report to Dr. Major, ODAA, and the ISU Police because the

15   defendant had spurned your advances for a romantic

16   relationship?

17        A.   No, I had made no advances.

18             MS. FOSTER:  I have nothing further.

19             THE COURT:  Thank you.  Mr. Prior.

20             MR. PRIOR:  Thank you, your Honor.

21                        CROSS EXAMINATION

22                        BY MR. PRIOR:

23        Q.   Ms. Hunt, I want to direct your attention

24   specifically between Saturday, December 24th, 2005, and --

1    through Saturday, April 22nd, 2006, okay.

2        A.    Okay.

3        Q.    Through this period.  Now, as far as December

4    24th, the fall semester was already over at that time.  I

5    mean, it's Christmastime, it's Christmas season; is that

6    correct?

7        A.    That's correct.

8        Q.    Okay.  And then you've already completed your

9    thing with the jury.  You probably already gotten your

10   grades at that time; is that correct?

11       A.    Probably.

12       Q.    Okay.

13       A.    I'm not for sure, though.

14       Q.    All right.  And now we go into -- through

15   Saturday, April 22nd, 2002.  Now we are into spring break,

16   and spring break --

17            THE COURT:  Did you say 2002?

18            MR. PRIOR:  Or 2006, I'm sorry.  Stand corrected,

19   2006.

20       Q.    (By Mr. Prior)  So Saturday, April 22nd, 2006, now

21   you are into spring break -- or not spring break, but you

22   are in the spring semester; is that right?

23       A.    Yes.

24       Q.    Okay.  Now during the spring, you're a junior, and

1    you're going to have a recital; is that right?

2         A.    Uh-huh.

3         Q.    Okay.  So when you have a recital, you don't have

4    any juries?

5         A.    Not that semester.

6         Q.    Pardon?

7         A.    Not that semester.

8         Q.    Okay, okay.  So from December 24th, 2005, through

9    April 22nd, 2006, Professor Forbes had no way of controlling

10   your grades; is that right?

11        A.    Um, I guess that may be true if you look at it

12   from the direct standpoint.

13        Q.    Pardon?

14        A.    If you look at it from a direct standpoint.

15        Q.    Right.  Because you didn't have a class with him?

16        A.    Right.

17        Q.    And he wasn't in a jury?

18        A.    That's correct.

19        Q.    And he wasn't your direct teacher, and that direct

20   teacher is the only person that grades you on your recital;

21   is that right?

22        A.    I don't think we get a grade for our recitals, but

23   maybe we do.

24        Q.    So you might not even get a grade for recitals?

1        A.    Right.

2        Q.    Okay.  Now, have you ever told anyone that, hey,

3   you owe me?

4        A.    Have I ever said that to anyone?

5        Q.    Yeah.  Have you ever said that, hey, you owe me?

6        A.    Maybe when I was little.  I don't recall a

7   specific time.

8        Q.    Okay, just when you were little?

9        A.    It's possible.

10       Q.    Okay.  It's possible you've said that?

11       A.    It's possible.

12       Q.    Okay.  Now, when you told someone that, hey, you

13   owe me, did that always imply sex?

14       A.    No.

15       Q.    Now, isn't it true that Dr. Forbes did not ever

16   say that you owe me sex?

17       A.    Those words?

18       Q.    Right.

19       A.    No.

20       Q.    He never said that?

21       A.    No.

22       Q.    Now, isn't it also true that I owe you can have

23   many different meanings?

24       A.    It can.

1       Q.    Now, when Dr. Forbes told you that you owed him,

2  at least you believed that he was referring to the 2006

3  Epiphany Church Easter gig; is that right?

4       A.    That was made clear, yes, sir.

5       Q.    Pardon?

6       A.    That was made clear, yes, sir.

7       Q.    So you believe that's what he was referring to.

8             Now, isn't it also true that the Easter gig at the

9  Epiphany Catholic Church isn't affiliated with ISU?

10      A.    Not directly, no.

11      Q.    Okay.  Ms. Hunt, isn't it true that you played

12  with Professor Forbes on Christmas Eve at Epiphany Catholic

13  Church in the year 2004?

14      A.    It's possible.

15      Q.    Okay.  Now, isn't it also true that you played

16  with Professor Forbes on Christmas Eve at Epiphany Catholic

17  Church in the year 2005?

18      A.    That is for sure true, yes, sir.

19      Q.    Okay.  And during both of those gigs, I guess

20  you'd call them, you were paid; is that right?

21      A.    Yes, sir.

22      Q.    And you were paid by the Catholic Church,

23  Epiphany?

24      A.    Yes, sir.

1      Q.    Now, how old were you, Ms. Hunt, back on December

2   24th, 2005?

3      A.    Um, 20 maybe.

4      Q.    Pardon?

5      A.    Twenty, maybe.

6      Q.    How old are you now?

7      A.    I am 22.

8      Q.    You're 22.  And your birthday is?

9      A.    January 1st.

10      Q.    January 1st?

11      A.    Yes, sir.

12      Q.    So you're 22 now?

13      A.    (Nodded head up and down).

14      Q.    So on December 24th, 2005, you were 20 years old?

15      A.    I believe so.  I'm not very good at math.

16      Q.    Okay.  Well, 2005 -- 2006 would have been New

17   Year's Day, your birthday?

18      A.    I would have been 21.  So, yes, sir, 20.

19      Q.    Okay, you would have been 21.  Let's now direct

20   your attention to Saturday, February 19th, 2005.  And this

21   is the Tuba House incident that you were talking about?

22      A.    Yes.

23      Q.    Now, isn't it true that the Midwest Tuba

24   Conference occurred during that whole kind of week, at least

1       started on Thursday maybe and went to Saturday?

2            A.   Yes, sir.

3            Q.   Okay.  Now, it -- this is a big conference for the

4       ISU and for the Music Department, this tuba conference?

5            A.   Yes, sir.

6            Q.   And isn't it true that usually at the end of these

7       conferences there's part -- or a party and there's a

8       get-together with faculty and students, maybe some of the

9       students are from different universities who have performed

10      or been there?

11           A.   I've never known another instance where a faculty

12      member was at a student party.

13           Q.   Okay.  So in this case you're saying that there

14      was no other faculty members except for Dr. Forbes?

15           A.   No, sir, I'm not saying that.  There might have

16      been.  I'm saying at other music major parties there's never

17      faculty there.

18           Q.   Again, this was a party that took place after this

19      big Midwest Tuba Conference?

20           A.   Yes, sir.

21           Q.   Where it involved a lot of different students from

22      a lot of different universities and also faculty members

23      from other universities?

24           A.   They were at the university, yes, sir.

1      Q.   Okay.  And at this specific tuba party, Dr. Forbes

2  was there?

3      A.   Uh-huh.

4      Q.   And were there other faculty members there?

5      A.   It's possible.  I don't recall seeing any.

6      Q.   Do you know who John Stevens (phonetic) is?

7      A.   I have heard the name, yes, sir.

8      Q.   Do you know Professor Thurman (phonetic)?

9      A.   I believe I've heard the name.

10      Q.   Okay.

11      A.   I don't know them.

12      Q.   You're just not sure if any of these other faculty

13  people were there?

14      A.   I didn't see them.

15      Q.   All right.  Now, in your testimony earlier today,

16  you indicated that Professor Forbes bumped into you or put

17  his hand on your belly, and you thought that was

18  inappropriate?

19      A.   Yes, sir.

20      Q.   Okay.  And so that was the first time you felt

21  that something might be, you know, might have your doubts

22  about Dr. Forbes?

23      A.   I believe that was the major turning point in my

24  thoughts about it.

1     Q.   At the tuba party, and that was in 2005.  Now, I

2  also believe earlier you testified that you thought he was

3  drunk?

4     A.   I thought he was slightly intoxicated if not more

5  than that.

6     Q.   Okay.  Now, you also indicated that you weren't

7  drinking?

8     A.   I don't recall drinking at that time.  It's

9  possible I had been.

10    Q.   Okay.  And how old were you then back in 2005?

11         MS. FOSTER:  Objection, your Honor.  We've been

12  over this.

13         MR. PRIOR:  Well, I think I can ask this -- I'll

14  withdraw the question.

15    Q.   (By Mr. Prior)  But isn't it true you were

16  underage at that time?

17    A.   Yes, sir.

18    Q.   Okay.  You were underage but you were drinking?

19    A.   Yes, sir.

20    Q.   In fact, directing your attention to -- this is I

21  believe Page 10, your Honor, of the State's Exhibit No. 3 --

22  isn't it true, Megan, that on the tape you indicated, and

23  I -- I'll read this.  Megan Hunt -- or Michael Forbes:  You

24  were flirtatious back.  And then Megan Hunt, you said I was

1    also drunk.  That's why I didn't make a big deal about it.

2    Isn't that true you said on the tape that you were drunk on

3    this?

4         A.   If it says I said that, then yes, sir.

5         Q.   Okay.  Now, Ms. Hunt, do you remember playing at

6    the Brass Band of Central Illinois with Professor Forbes

7    back on September 11th, 2005, at the old capital?

8         A.   I do, yes.

9         Q.   It's the old courthouse?

10        A.   Yes, sir.

11        Q.   Now, it's true this Brass Band of Central Illinois

12   isn't affiliated with Illinois State University?

13        A.   No, it is not.

14        Q.   Okay.  Now, isn't it true that you told Dr. Forbes

15   that you owed -- that he owed you after you played at this

16   gig because it was long, cold, windy, and I don't think you

17   guys got any money for it?

18        A.   I don't recall saying that.

19        Q.   You don't recall saying that?

20        A.   No, sir.

21        Q.   Is it possible that you could have said that?

22        A.   Anything's possible.  It's possible I could have

23   said that, I guess.

24        Q.   Okay.  Now, directing your attention to I believe

1    the date was Tuesday, May 2nd, 2006.  That's when you went

2    and you talked to the -- to the police at ISU.  I think you

3    went there with Shane McCreery from the -- he's the Director

4    of Diversity and Affirmative Action.  Do you remember that

5    date?

6        A.   Not the date specifically.  I do remember going to

7    the police station.

8        Q.   Okay, you remember going there.  And then at the

9    police department you spoke to I believe Captain Don Knapp?

10       A.   Yes, sir.

11       Q.   And that's when you told him that you believed

12   that the tuba party that's back in February of '05 that Dr.

13   Forbes purposely rubbed up against you?

14       A.   Purposely, yes, sir.

15       Q.   Now, Ms. Hunt, isn't it true that if you believed

16   Professor Forbes purposefully rubbed up against you back in

17   February 2005, then you could have from that moment forward

18   taken preventative measures to avoid contact with Professor

19   Forbes?

20       A.   It's possible I could have taken limited measures,

21   yes, sir.

22       Q.   Okay.  Nevertheless, seven months after the party

23   at the Tuba House, on or about September 11th, 2005, you

24   agreed to play in this Brass Band gig at the courthouse, the

1    old courthouse, with Professor Forbes?

2          A.   Several students were in that gig.

3          Q.   Including yourself?

4          A.   Including myself.

5          Q.   And in no way is this gig connected with ISU

6    because it, again, is the Brass Band?

7          A.   That's correct.

8          Q.   And then just a little more than two months later

9    on December 24th, 2005, you agreed to play with Professor

10   Forbes at Epiphany Catholic Church?

11         A.   Yes, sir, and members of the Brass Faculty.

12         Q.   Pardon?

13         A.   And other members of the Brass Faculty.

14         Q.   Okay.  Now, it's your -- it's your testimony that

15   the -- this band was made up specifically of members of the

16   faculty at ISU?

17         A.   Yes, sir.

18         Q.   So, is it your belief that this was the faculty

19   playing at this Catholic church gig?

20         A.   I don't think I understand the question.

21         Q.   Okay.  Is it your belief that this was -- isn't it

22   true that there's a faculty quartet that the Mr. Forbes also

23   plays in?

24         A.   There's a faculty Brass Quintet, yes, sir.

1    Q.   Oh, it's a quintet, fine, sorry.   So he plays in

2 this thing, or this group, but that would be in his official

3 capacity?

4    A.   Yes, sir.

5    Q.   Okay.   Because the faculty does have that group?

6    A.   Yes, sir.

7    Q.   Is it your belief that you were playing in an

8 official capacity with this group at the Epiphany Church on

9 Christmas?

10    A.   Are you asking me if I was the Professor of

11 Trombone for the evening?

12    Q.   No, I'm not asking you that.   But I'm asking you

13 if you thought maybe one of the professors wasn't available

14 and maybe you just filled in?   But was it your belief that

15 you were actually playing in this faculty quintet?

16    A.   For that evening, yes, sir, I was.

17    Q.   Okay.   And who -- who paid you for that?

18    A.   Epiphany Church did.

19    Q.   Epiphany Church?

20    A.   Yes, sir.

21    Q.   So you weren't being paid by ISU?

22    A.   No, I was not.

23    Q.   Now, additionally, not more than three months

24 later I think around March of 2006, after you played at this

73

1    Epiphany gig then you allowed Professor Forbes to get in the

2    car with you, correct?

3         A.   Do you mean the night we already spoke about?

4         Q.   Yeah, I guess it was a rainy night.

5         A.   Yes, sir.

6         Q.   This was like in March of 2006?

7         A.   Yes, sir.

8         Q.   Before this date you had had problems with Dr.

9    Forbes, correct?  At least you thought that he was

10   inappropriate at least on the tuba night?

11        A.   He made me uncomfortable at times, yes, sir.

12        Q.   But you still allowed him into your car?

13        A.   I did.

14        Q.   Now, in the car, isn't it true that Dr. Forbes

15   acknowledged to you that if you two engaged in any type of

16   activity, he had to be careful because he had these other

17   allegations?

18        A.   He told me about previous allegations, yes, sir.

19        Q.   And so he had to be careful, make sure it was

20   consensual because of these other allegations?

21        A.   Yes, sir.

22        Q.   Now, your testimony is -- is that he was the one

23   who was making the advances and you were just the recipient;

24   is that right?

1      A.    Yes, sir.

2      Q.    Now, at that time you knew that he was married,

3    correct?

4      A.    I did.

5      Q.    Isn't it true that one of your outs would have

6    been, hey, Dr. Forbes, you know I think you're a nice guy

7    and everything, but, you know, I don't -- I don't have any

8    type of sexual activity with married -- a married man

9    because I'm single?  I don't want to be part of an

10   adulteress affair?

11     A.    I told him several times to leave the car.

12     Q.    That's not the question.  Isn't it true that that

13   would have been -- you could have said that as an out, and

14   that would have been a good out?

15     A.    I could have said several things.  One of them I

16   said was please get out of my car.

17     Q.    But you never said anything about you don't want

18   to take part in an adulteress affair?

19     A.    I did not use those words, no, sir.

20     Q.    Okay.  And you were also aware, isn't it true,

21   that you did have an out with the Office of Diversity and

22   Affirmative Action, because Professor Forbes told you that

23   that body had investigated him on prior incidents, correct?

24     A.    I'm not sure I understand the question there.

75

Q.    Okay.   You knew that this Office of Diversity and
Affirmative Action existed, correct?

A.    Oh, actually, I had no idea really.

Q.    Now, in freshman orientation don't they give you
as students an introduction that would include this, that
hey if you're sexually harassed or if you're harassed by a
teacher or a staff or anything like that, then your avenue
would be to go to what's called the Office of Diversity and
Affirmative Action?

A.    It's possible.  We missed a lot of that because we
had marching band camp that week as a freshman.

Q.    So you might have missed that part?

A.    It's possible.

Q.    But isn't it true that Dr. Forbes informed you
that he had these other cases, these old cases, with that
department?

A.    He told me that he had two allegations from two
other students.  I don't believe he used the department term
but it's possible.

Q.    It's possible he used it?

A.    It's possible.

Q.    In fact, on the tapes I believe in one of the
tapes we heard today, you indicated that he constantly told
you about that he has to be careful because he has to make

1    sure it's consensual because of these prior incidents?

2         A.   He never said that he had to be sure it was

3    consensual, but he did tell me that he would get in a lot of

4    trouble if anybody found out.

5         Q.   Right.  And you told him that you were not going

6    to tell anybody, that you promised him that you weren't

7    going to --

8         A.   I did say that.  I also told him that if he was

9    worried about it he shouldn't continue.  I did tell him

10   that.

11        Q.   You did tell him that you weren't going to tell

12   anybody?

13        A.   I did, yes, sir.

14        Q.   And the discussion even led to the subject of oral

15   sex; is that correct?

16        A.   I don't remember that part, but according to the

17   tapes it did, yes, sir.

18        Q.   Okay.  And you on the tapes indicated that at

19   least, and even in your earlier testimony you indicated that

20   at that time you told Dr. Forbes that you weren't

21   comfortable doing oral sex?

22        A.   I don't remember saying that today, because I

23   don't remember saying that anymore, but the tapes said I do,

24   I did say that.

1    Q.    So since the tapes say it, do you believe you said

2    it?

3    A.    Yeah, the tape said it.

4    Q.    Okay.  Okay, then about a month after that, that

5    incident in the car, again, you agreed to the Epiphany gig,

6    the Easter gig that occurred on the evening of April 15th;

7    is that right?

8    A.    I did, yes.

9    Q.    And that's something you could have turned down if

10   you wanted to, correct?

11   A.    I could have, yes, sir.

12   Q.    Okay.  And a lot of students, they are not

13   available at Easter or Christmas because they are back home?

14   A.    That's true.

15   Q.    And isn't it true that you lived in the Quad

16   Cities?

17   A.    My mother did, yes, sir.

18   Q.    Okay.  But when you would go back home on vacation

19   during this time, where was home for you?

20   A.    I had my own apartment in Bloomington, and my

21   mother lived in the Quad Cities.

22   Q.    Okay.  Would you on occasion go back --

23   A.    Sometimes, yes, sir.

24   Q.    -- to the Quad Cities for break?

1     A.   Sometimes.

2     Q.  Do you remember on this -- on this -- on Easter,

3  for instance, did you stay in your apartment or did you go

4  back to the Quad Cities?

5     A.  I do not remember.

6     Q.  This is a voluntary thing, and you knew Dr. Forbes

7  was going to be there, and you agreed to do it?

8     A.  Yes, sir.

9     Q.  Now, on this Saturday evening, actually it was two

10  nights, wasn't it, this Easter gig?  Wasn't the Easter vigil

11  on the 15th, then the next day you had to play Easter on

12  Easter Sunday?

13     A.  It's possible.  I don't remember, I'm sorry.

14     Q.  And do you remember the people that made up this

15  group of musicians?  Specifically, do you remember who was

16  there?

17     A.  I do not, no.

18     Q.  Okay.  But -- now, isn't it true there was a lot

19  of students in this gig, and that it would have been made up

20  of people from the Central Illinois Brass Band?

21     A.  I don't think I know the answer to that question.

22     Q.  Okay.  You just don't know who was there?

23     A.  It's -- I --

24     MS. FOSTER:  Objection, your Honor.  She said

79

1    multiple times she doesn't remember who's in it, she doesn't

2    know if people from the Brass Band are in it.  It's been

3    asked and answered multiple times.

4            MR. PRIOR:  Well, I don't think it has, your

5    Honor.  There's three different times she's played at

6    Epiphany, and I was zeroing in on this Easter gig.

7            THE COURT:  She's indicated she doesn't remember

8    with respect to that one.

9            MR. PRIOR:  Okay, that's fine.

10           THE COURT:  Sustained.

11       Q.   (By Mr. Prior)  Now, directing your attention to

12   preparing for the Easter gig.  And you indicated that at one

13   time you were in the practice room.  This is before Easter,

14   correct?

15       A.   Yes, sir.

16       Q.   You were practicing your music.  And you said you

17   were practicing the Easter music because you were going to

18   give the gig next week, right?  This is about a week before

19   the gig?

20       A.   It was the same night I received the music from

21   Dr. Forbes I went straight down to the practice room to

22   practice it.

23       Q.   Okay.  And you said that he went -- he came down

24   to the basement of the building; is that right?

1    A.   Yes, sir.

2    Q.   And that's where the practice rooms are?

3    A.   (Nodded head up and down).

4    Q.   And where is Dr. Forbes' office?

5    A.   It's on the first floor.

6    Q.   Isn't it true there aren't any bathrooms on the

7  first floor of that building?

8    A.   That's true, yes, sir.

9    Q.   Isn't it true also that this is a bathroom down in

10 the basement?

11    A.   On the other side of the basement, yes, sir.

12    Q.   Okay.  Now, isn't it true that Dr. Forbes told you

13 that if you wanted to practice Easter music that you could

14 do so in his office?

15    A.   I do not remember if that is what he said.

16    Q.   Okay.  But, in any event, you told him that you

17 didn't want to go up to his office, correct?

18    A.   Yes, sir.

19    Q.   And isn't it true that he respected that no, and

20 you didn't go up to his office?

21    A.   He did not force me to go to his office, no, sir.

22    Q.   And he was down in your practice room, and it was

23 just you and him, correct?

24    A.   Yes, sir.

1      Q.   And he did not -- even though you weren't in his

2   office, he didn't force you to do anything in the practice

3   room, did he?

4      A.   No, sir.

5      Q.   And I believe on the tape it even mentioned that

6   things were kind of dead at that time in the building.

7   There wasn't a lot going on?

8      A.   No one -- I don't think anyone else was there.

9   It's possible though.

10      Q.   Okay, all right.  Now, Ms. Hunt, Professor Forbes

11   and his wife never forced you to baby-sit for them on April

12   22nd, 2006, did they?

13      A.   No.

14      Q.   And you had baby-sat for them on previous

15   occasions, correct?

16      A.   Yes, sir.

17      Q.   In fact, on one of those occasions isn't it true

18   that you once baby-sat for them on New Year's Eve?

19      A.   That is true.

20      Q.   And do you remember what year that was?

21      A.   I do not, no.

22      Q.   Okay.  But it was on New Year's Eve?

23      A.   Yes, sir.

24      Q.   And your birthday is the next day; is that right?

1      A.    Yes, sir.

2      Q.    Do you remember after that incident -- when they

3   came back from the New Year's Eve party, do you remember

4   telling them, hey, you guys owe me for this because it was

5   your birthday and because you'd baby-sat on New Year's Eve?

6      A.    I don't think I ever said that.  I chose to

7   baby-sat -- baby-sit for them that night.

8      Q.    Okay.  But could you have said that?

9      A.    It's very doubtful.

10      Q.    Okay.  Now, in your statements to Captain Knapp

11   May 2nd, 2006, you told him that on April 22nd Professor

12   Forbes never threatened or physically forced you to do

13   anything, correct?

14      A.    It's possible.  I don't recall.

15      Q.    Okay.  And, in fact, isn't it true that you

16   allowed Professor Forbes to pull the waist of your pants

17   down low enough to see your tattoo which is located below

18   and to the right of your navel?

19      A.    He did do that, yes, sir.

20      Q.    And you allowed him to do that?

21      A.    He did it.

22      Q.    And you didn't tell him not to do it?

23      A.    I did push him away, yes, sir.  That even says it

24   on the tapes.

1      Q.   My question though is you didn't firmly tell him

2   not to do it?

3      A.   I did not firmly tell him, no.

4      Q.   And on that occasion you kissed -- you, in fact,

5   kissed Dr. Forbes, correct?

6      A.   I did when he asked me to when he said that he

7   would leave if I did, yes, sir.

8      Q.   And isn't it true that you kissed him on the lips?

9      A.   That is true.

10     Q.   Now, on that occasion did you ever tell Captain

11  Knapp that Professor Forbes also rubbed your crotch and

12  fondled your bare breasts beneath your shirt?

13     A.   I don't believe so, but it's possible.  I don't

14  remember that happening anymore.

15     Q.   Okay.  But it could have happened or you could

16  have told the police officer that that's what happened?

17     A.   If that's what happened, I told him that's what

18  happened, but I don't remember that anymore.

19     Q.   Okay.  Wouldn't you agree with me that if he

20  actually rubbed your crotch and fondled your breasts, that

21  that might be something you might remember?

22     A.   There's a lot of things I remember about it.

23     Q.   But that is not one of them?

24     A.   That is not one of them at this time, no.