1    Q.    Okay.  And all this fondling and kissing and

2  whatever, tattoo kissing, this happened before you sat on a

3  sofa with Dr. Forbes; is that correct?

4    A.    The tattoo incident did happen before I sat on the

5  sofa.  I'm not sure what you're asking about the other one

6  specifically.

7    Q.    Okay.  Do you remember in what order as far as the

8  kiss did -- when you kissed Dr. Forbes was that done before

9  you sat on the couch?

10    A.    I do not remember that, no.

11    Q.    Okay.  But it's possible it could have been?

12    A.    I don't really know how to answer that.

13    Q.    Okay.  Let's go on to the next question.  So after

14  the tattoo incident, that happened in the foyer of the home

15  next to the door right when you guys met?

16    A.    Um, yeah.  It's kind of like you would go in, and

17  it opened up to the living room.  So it was the area right

18  next to the door but in the living room.

19    Q.    Okay.  But it's right next to the door --

20    A.    Yes, sir.

21    Q.    -- where he kissed your tattoo that was below your

22  navel?

23    A.    Yes, sir.

24    Q.    And you say that you pushed him away?

85

A.   I did.

Q.   Okay.  Now, the couch is pretty far away from that incident or that area next to the door in the foyer.  Isn't the couch way on the other side of the wall?

A.   Probably about four steps from where we were.

Q.   Okay.  Now, when he was on his knees and you were right there next to the door, you could have just, if you were uncomfortable, you could have just walked out the door?

A.   He was between the door and I.

Q.   So you felt that he might tackle you or something?

A.   In the back of my mind I thought it could have been a possibility at the time, yes, sir.

Q.   And so that's why you didn't try to run past him?

A.   Yes, sir.

Q.   Now, after he was on his knees, then you agreed to walk back to the couch?

A.   I did, yes.

Q.   And you say that's at least four steps.  And isn't it true when some sexual activity occurs in a situation where it occurred when you were both on your feet or he was on his knees, that going to a couch with the person would be even more dangerous situation?

MS. FOSTER:  Objection.  She can't testify as to what the defendant was thinking or how the defendant was

1   going to interpret her going to sit on the couch.  Calling

2   for speculation on her part.

3           MR. PRIOR:  Judge, I'm going to ask -- not asking

4   for speculation.  I'm just asking isn't it true that a more

5   dangerous situation could occur on the couch than where they

6   already were?  I think I can ask that.

7           MS. FOSTER:  Speculation.

8           THE COURT:  It's speculation as to what his

9   intentions would be.  I suppose he can ask her about whether

10  that crossed her mind in the course of that activity.

11          MR. PRIOR:  That's what I'm going for, your Honor.

12      Q.   (By Mr. Prior)  Isn't it true that in your mind

13  going over to the couch would be more dangerous?

14      A.   In my mind, the whole situation was dangerous.  I

15  don't believe it made it more so dangerous.

16      Q.   Now, there is a backdoor to the residence, right?

17      A.   There is, yes.

18      Q.   And he wasn't standing between you and the

19  backdoor, was he?

20      A.   There's a fence around the backyard, and I don't

21  know where the gate is out of the backyard.

22      Q.   You baby-sat there for a long time?  Or a few

23  occasions you had baby-sat there?

24      A.   Um, a few, yes, sir.

87

1      Q.   So isn't it important for a baby-sitter to know
2  the different exits in and out of the home?
3      A.   I knew how to get out of the house.  I did not
4  know how to get out of the yard.
5      Q.   So it's your testimony there's locks on the fence?
6      A.   That's not my testimony.  That's not what I said.
7  I said I don't know where the gates are.
8      Q.   Okay.  Are the gates locked?
9      A.   I don't know.  I've never seen them.
10          MS. FOSTER:  Objection, your Honor.
11          THE COURT:  She said she didn't know where they
12  were or how to get out.
13          How -- let me ask you how much longer do you have
14  with this witness?
15          MR. PRIOR:  I've got a little bit more, your
16  Honor.  Maybe -- it's hard to say -- say another 10 or 15
17  minutes.
18          THE COURT:  All right, continue.
19      Q.   (By Mr. Prior)  So it's your testimony you've
20  never been in the backyard?
21      A.   I don't think so, no.
22      Q.   Okay.  Directing your attention to April 20th,
23  this was on a Thursday.  And isn't it true that you called
24  Dr. Forbes when he was down in Greenville, North Carolina?

1        A.    I don't recall.

2        Q.    Okay.  Could you have made that call?

3        A.    I -- I don't know how to answer that question.

4        Q.    Well, you agreed to baby-sit for the Forbes on the

5    specific date of April 22nd?

6        A.    I did agree to that, yes, sir.

7        Q.    Okay.  Now, do you remember a telephone

8    conversation with Dr. Forbes that occurred two days earlier

9    on April 20th?

10       A.    I do not, no.

11       Q.    Do you remember on the tapes you indicating that

12   on this phone call -- this might refresh your memory -- but

13   you -- I believe Dr. Forbes during this phone conversation

14   indicated you -- you said you owed him, and you said, no,

15   the only thing we talked about during this phone

16   conversation was softball games and also baby-sitting.  Do

17   you remember that portion on the tapes?

18       A.    On the tapes, I do remember hearing that on the

19   tapes, yes.

20       Q.    Okay.  So on the tapes there was this evidence of

21   a phone conversation between you and Dr. Forbes?

22       A.    Yes, sir.

23       Q.    And he had told you that when you called him he

24   was down in Greenville, North Carolina, filling up his car,

1   and you indicated that you were with somebody else, some

2   other guy?

3         A.   I believe that was on the tapes.

4         Q.   Yeah, that was on the tapes?

5         A.   I don't remember.

6         Q.   Okay, but that was on the tapes.  Now, isn't it

7   true during this phone conversation that you asked

8   Mr. Forbes why isn't -- why aren't you baby-sitting more

9   often or whatever, and he did say, hey, I do have a

10   baby-sitting job coming up on the 22nd?

11         A.   I don't recall.

12         Q.   Okay.  But could that have happened?

13         A.   I don't know how to answer that question.

14         Q.   Just answer as truthfully as you can.

15         A.   It's possible that anything could have happened.

16   I don't remember that happening.

17         Q.   Do you remember specifically how you got the

18   baby-sitting gig?

19         A.   I do not, no.

20         Q.   Okay.  Now, on April 22nd, 2006, when you

21   testified that you were uncomfortable around Dr. Forbes, at

22   that time you were dating Brian; is that right?

23         A.   Yes, sir.

24         Q.   Now, isn't it true that that would have been an

1  additional out for you?

2      A.   Yes, sir.

3      Q.   And you never -- you never told Dr. Forbes that,

4  hey, I'm in a relationship with Brian and I don't want to

5  have any hanky-panky or whatever?

6      A.   I assumed he knew that I was in a relationship.

7  It was common knowledge in the Music Department.

8      Q.   But the question is you never told him, hey, I'm

9  in a relationship with Brian and I don't want to do anything

10 with you?

11     A.   Before it happened?

12     Q.   Right.

13     A.   I don't believe so.

14     Q.   Okay.  Now, you never agreed to exchange sex for

15 the opportunity to work, have you?

16     A.   No.

17     Q.   And you never agreed to give professional --

18 Professor Forbes oral sex in exchange for him giving you the

19 opportunity to make $250.00 for playing in the band, did

20 you?

21     A.   No.

22     Q.   And it's true that Professor Forbes never made

23 that proposition?

24     A.   Could you define proposition?

1    Q.   Yeah.  It's true that Professor Forbes never came

2  up to you and said hey, Megan, if I can get you this gig at

3  Epiphany Church for 250 bucks, then would you give me oral

4  sex?

5    A.   He never said that, no.

6    Q.   Now, isn't it also true when you were engaging in

7  these activities with Dr. Forbes you felt a little

8  unfaithful to Brian Flick (phonetic) who you were dating at

9  the time?

10    A.   Unfaithful?

11    Q.   Uh-huh.

12    A.   That was not the first emotion that crossed my

13  mind, no, sir.

14    Q.   Now, isn't it true that you filed a civil suit

15  against both the university and Dr. Forbes?

16    A.   It has been filed, yes, sir.

17    Q.   Okay.  And isn't it also true that you're asking

18  for the following damages in this suit --

19        MS. FOSTER:  Judge, I object to the relevance of

20  this.  She's already -- she answered that yes, she's filed a

21  civil suit.  I don't think we need to get into the exact

22  damages she's requesting.  I -- I understand why you're

23  asking -- why defense counsel is asking about civil suits

24  that are filed as it goes to her possible bias, but I don't

1    see the relevance of asking about every single damage that's
2    requested within the suit.
3           MR. PRIOR:  Judge, goes to motive.  This is -- and
4    that's always ripe.  Motive is also ripe.  Traditionally,
5    when there's a criminal case the civil suit isn't filed
6    until later just because of this, because it opens up the --
7           THE COURT:  The objection is overruled.
8           MR. PRIOR:  Thank you, your Honor.
9    Q.    (By Mr. Prior)  Isn't it true that you have sued
10   both Illinois State University and Dr. Forbes?
11   A.    I believe that is true, yes.
12   Q.    And isn't it correct that you're seeking the
13   following damages in your suit against Dr. Forbes and ISU:
14          A judgment for compensatory damages in the amount
15   of $500,000.00 against the defendant Michael Forbes and ISU?
16   A.    I had not heard that exact figure before today.
17   Q.    Could that be true?
18   A.    Could it be true?
19   Q.    Uh-huh.
20   A.    Yes, it could be true.
21   Q.    And you've hired an attorney, correct?
22   A.    I have, yes, sir.
23   Q.    Okay.  And then also a judgment for punitive
24   damages in the amount of $100,000.00 against defendant

93

1    Michael Forbes.  Is that what you're asking for?

2        A.   It's possible.

3        Q.   Okay.  And then, finally, reasonable attorney fees

4    and expenses in prosecuting the action?

5        A.   That's possible.

6        Q.   Okay.  Now, a big controversy I guess is whether

7    or not Dr. Forbes pulled his own penis out of his pants or

8    whether you did that act, correct?

9        A.   In big controversy?

10       Q.   Yeah.  I mean, you're indicating that he pulled

11   his own penis out of his pants; is that right?

12       A.   Yes, I am.

13       Q.   Okay.  Now, on the tapes -- I believe this is on

14   Page 14 -- this was on the State's No. 2, the top of Page

15   14, do you remember this on the tapes?  This is Michael

16   Forbes talking:  You can always say well, no, we -- you can

17   even say you felt awkward about how we were kidding at the

18   house or whatever, you know, and then you left and I felt a

19   little disturbed about -- by some of -- if you have to go

20   that route.  Then you wouldn't need to say that -- I believe

21   "you" should be in there -- pulled my thing out and

22   whatever.  And you said, yeah.  And then Michael Forbes

23   saying we don't have to say that part, and then you saying,

24   no, definitely not?

1    A.   I don't -- I don't think I understood half of what

2  you said.  I'm sorry.

3         MR. PRIOR:  Well, your Honor, permission -- what

4  Mr. Forbes has done, we can lay the foundation for this

5  later I guess, but foundation will be forthcoming, but we've

6  made a DVD -- a CD or whatever -- but he's made this CD and

7  he's got it on specific track and we can follow it on this

8  CD.  And I've got my laptop, and I think Jane has a DVD

9  player.

10        MS. FOSTER:  I --

11        MR. PRIOR:  I think it would be better on my

12  laptop so I can go to it.  So with permission of the Court,

13  if I could refresh her recollection with this, we could play

14  it as Defendant's A for the purpose --

15        THE COURT:  Have you heard this yet?

16        MS. FOSTER:  No, I've not heard this.

17        THE COURT:  Is seems to me you inserted the word

18  into part of the transcript you were reading from.

19        MR. PRIOR:  And I think that's key, your Honor,

20  because we did have a transcript, too, and this is going to

21  come later on.  And Mr. Forbes I think he can lay the

22  foundation that he prepared a transcript, and in his

23  transcript he does have you pulled my thing out and

24  whatever, and I think this tape would -- would help her

1    refresh her recollection as far as she doesn't remember

2    saying it, and this would help her.

3              And I believe the Rules of Evidence say that she

4    could have her memory refreshed on the back of a shoe if

5    needed be.  So I think this would be proper for refreshing.

6         A.   I didn't say my memory wasn't refreshed.  I said I

7    couldn't understand what you were saying.

8              MR. PRIOR:  That's because of the tape, the

9    transcripts.  I'm just reading off of the tape.  It is kind

10   of jumbled, but there is a last sentence that does clearly

11   say he wouldn't need to say that, and then Mr. Forbes has

12   from the recording put in his transcript you pulled my thing

13   out and whatever, and then Megan Hunt saying yeah, and then

14   Michael Forbes we don't have to say that part, and then

15   Megan Hunt said no, definitely not.  And it does logically

16   fit in there.  I know it's an inaudible on the prosecution's

17   transcript, but I think it's clearer if we go over it again.

18             MS. FOSTER:  I guess I have concerns about how

19   this tape was made.  I mean, if it's prepared by the

20   defendant and he's taking out excerpts, I mean, what

21   guarantees do we have on the reliability of this?

22             If they want to go back to the tape that's being

23   offered by the State which is the original which has been

24   placed in evidence, find that portion of the call and play

96

1    that portion from the original evidence tape, I have no

2    problem with it.  What I do have a problem with is something

3    that's been manufactured I don't know where by who under the

4    defense's direction, which what guarantees of reliability do

5    we have, especially if as defense counsel is saying a word

6    has been inserted -- they found a word that goes to their

7    position?  That's my concern.

8            MR. PRIOR:  Your Honor, the transcript's only a

9    guide for a jury or the trier of fact, and the foundation

10   can be laid.

11           THE COURT:  Well, how did he get the CD?

12           MR. PRIOR:  Well they, through discovery, they

13   gave us a tape.  And then what Mr. Forbes did is when he

14   heard portions of the tape that we wanted to be able to get

15   to right away -- because when you have a tape it's hard to

16   fast-forward and go to it right away -- he just copied and

17   he'd testify to this -- he just copied digitally onto this

18   CD so that we could go right to it.  I mean, I can put this

19   into my computer and I can go right to that spot.

20           THE COURT:  All right.  We are going take a

21   recess.  I'm going to suggest that you play that for Ms.

22   Foster and see what she thinks about that before we have any

23   further argument.  I'm going to do the sentencing hearing

24   that was scheduled for 1:30.

1    Ma'am, you're excused for right now.

2    (Whereupon the proceedings recessed).

3    (Witness resumes the witness stand).

4    THE COURT:  We're back on the record in 07 CF 55,

5    People versus Michael Forbes.  The defendant with Mr. Prior;

6    the State by Ms. Foster; Ms. Hunt returned to the witness

7    stand again.

8    I understand the parties have cued up the tape to

9    the point where we're -- that's reflected on the transcript

10   on Page 14.

11   MR. PRIOR:  Yes, your Honor.  And Ms. Foster has

12   found the original tape -- it on the original tape, so we've

13   agreed to play that.

14   MS. FOSTER:  Yeah.  Do you want me to start it?

15   MR. PRIOR:  Yeah.

16   (Whereupon the audiotape was played in open court).

17   Q.   (By Mr. Prior)  So, in that tape you just heard,

18   you heard you, you pulled my thing out, correct?

19   A.   Definitely at the time what I heard was him

20   talking about me not talking about it to anybody, and I was

21   just agreeing to not talking about it to anybody.  So I

22   don't think I specifically heard him say that at the time.

23   Q.   That's what the tape said.

24   A.   I heard it on the tape just now, yes, sir.  I was

1    listening for it.

2            MR. PRIOR:  No further questions, your Honor.

3            THE COURT:  All right.  Ms. Foster.

4            MS. FOSTER:  Thank you.  Just briefly.

5                    REDIRECT EXAMINATION

6                    BY MS. FOSTER:

7        Q.   Megan, on cross examination you testified that the

8    defendant had no direct effect on your grades for the spring

9    of 2006, correct?

10       A.   I believe so.

11       Q.   Okay.  Was there any other type of impact or

12   effect the defendant could have had on your success or your

13   track through the Music Department at that time?

14       A.   Huge.  Well, at the time I didn't know he was not

15   coming back for the next semester.

16       Q.   Okay.  And so what huge impact could he have had?

17       A.   Um, just in general on my music career.  It's a

18   very, very small world, and at the time -- I'm not sure now

19   -- but he was very, very well respected and very well known

20   throughout the whole music field, especially in brass.  Like

21   I said, at the time I had no reason to think he wasn't

22   coming back as a professor in the fall.

23       Q.   Okay.  Now, you were asked if you could have taken

24   measures to avoid being around the defendant after the

1    incident at the Tuba House.   Do you remember that?

2         A.   Yes, I do.

3         Q.   Now, after the incident at the Tuba House, did you

4    ever seek to be alone with the defendant?

5         A.   No.

6         Q.   Did you ever go looking for him so you could be

7    together, just the two of you?

8         A.   No.

9         Q.   Okay.   And you were asked about playing at the

10   Epiphany Church both for Christmas and for Easter.   What did

11   you believe could happen to you if you turned down that

12   opportunity?

13        A.   Um, I don't think it would have had direct

14   consequences, but I guess I don't think it could have had

15   direct consequences to turn it down.   It was good money for

16   an easy gig.

17        Q.   Did you think it was important to be part of that

18   performance?

19        A.   Very much so.

20        Q.   Now, you were then asked about a conversation you

21   and the defendant had in your car in the parking lot of Cook

22   Hall.  Do you recall that?

23        A.   Yes.

24        Q.   Now, who first raised the possibility of you and

1   the defendant having some type of relationship while you

2   were in the car?

3        A.   He did.

4        Q.   Did you ever ask him to be involved in a

5   relationship with you?

6        A.   No.

7        Q.   Did you ever tell him you wanted to be in a

8   relationship with him?

9        A.   No.

10       Q.   Now, you were also asked about how you said on

11  tape that you weren't going to tell anyone.   Remember that?

12       A.   Yes.

13       Q.   Okay.   And when you said that, what was the

14  context of you saying that?

15       A.   It probably happened numerous times, him saying

16  that he could get in a lot of trouble if I told, that I

17  could get in a lot of trouble if he told.   And like you

18  heard on the tapes, him saying that Siiri could go digging

19  around in my past.

20       Q.   Now, when these tapes were made, they were made as

21  part of the police investigation, correct?

22       A.   Yes.

23       Q.   And what was your purpose in participating in

24  these recorded conversations?

1      A.    Um, I think just to get evidence -- as much

2  evidence as I could for the trial.

3      Q.    And how were you going to gain that evidence?

4      A.    Through asking questions, letting him speak about

5  the incidents.

6      Q.    So you wanted the defendant to speak freely about

7  what had happened, right?

8      A.    As much as possible, yes.  That was what I was

9  told to do.

10      Q.    Do you believe he would have spoken freely if you

11  had said you were going to tell or you had already told?

12      A.    Absolutely not, no.

13      Q.    Okay.  Now, you were asked why you didn't report

14  the incident that happened in your car.  Do you recall that?

15      A.    Yes.

16      Q.    What did you perceive as being different between

17  the incident in the car in the parking lot and the incident

18  that happened at Dr. Forbes' house on April 22nd?

19      A.    Um, I felt it was much more physically intrusive.

20  I felt that at the incident at his house that it had been

21  about a week and a half to two solid weeks of badgering on

22  his part.  I mean, solid badgering on his part with the

23  $250.00 and just being more flirtatious.  Before the car

24  incident it was kind of out of the blue, you know, we were

102

1    just talking about the band.

2         Q.   So would you say his contact and comments to you

3    increased after you received the $250.00 for the Easter

4    performance at Epiphany Church?

5         A.   Much more, yes.

6         Q.   And you were also asked that you agreed to do

7    certain performances after the Tuba House incident and after

8    the incident in your car, correct?

9         A.   Um, I'm not sure if it was after the incident in

10   my car but definitely after the Tuba House party.

11        Q.   And when you were asked to be part of these

12   performances, was it ever going to be just you and the

13   defendant?

14        A.   No, never.

15        Q.   Now, I want to direct your attention to the

16   incident you were questioned about when you had received the

17   music for the Easter performance and you were down in the

18   practice room, okay.

19        A.   Yes.

20        Q.   Is Cook Hall open to students at any time in the

21   day?

22        A.   Depends on the student.  It's open during -- I

23   think up until 8:00 p.m. just in general open to the public

24   student population, and then after that time you have to

1    have a special code on your student ID to get in just for

2    music majors.

3        Q.   Okay.  But can music majors come into the

4    department -- into Cook Hall at any hour they want to?

5        A.   I think they can.  I think they've tried to close

6    it really late at night now like after 2:00, but I think so.

7        Q.   So while you were in the practice room and the

8    defendant was there, could other people have come into the

9    building or come into the practice rooms at that time?

10       A.   They could have, yes.

11       Q.   Okay.  Now, going to the incident that happened at

12   the defendant's house on April 22nd, you were asked if you

13   allowed the defendant to pull down your waistband and look

14   at your tattoo.  Do you recall that?

15       A.   Yes.

16       Q.   Did you ever ask him to do that?

17       A.   No.

18       Q.   Did you ever ask him to get on your knees in front

19   of you, grab your hips, and pull down the waist of your

20   pants?

21       A.   No.

22       Q.   Did you ever ask him to touch your tattoo?

23       A.   No.

24       Q.   Did you ever ask him to kiss your tattoo?

1          A.    No.

2          Q.    Did you ever ask him to do anything physical to

3     you on that day?

4          A.    Never.

5          Q.    Now, you were also asked if you thought going to

6     the couch was a more dangerous situation.   Do you recall

7     that?

8          A.    Yes.

9          Q.    And you testified that you thought the whole

10    situation was dangerous, correct?

11         A.    Yes.

12         Q.    So believing that the whole situation was

13    dangerous, what was your goal at that time during that

14    incident?

15         A.    To get out of the situation as safely as possible.

16         Q.    Okay.   So were you going to do whatever it took to

17    get yourself safely out of the situation?

18         A.    Yes, short of being raped, I believe I would have.

19         Q.    And what did you believe was safety for you or

20    getting out safely of that situation?

21         A.    For him to leave.

22         Q.    Okay.   Now, you were asked if you ever

23    specifically told the defendant that you didn't want to be

24    part of an adulteress affair or that you were dating someone

1    else and didn't want to participate in hanky-panky, correct?

2    Do you recall that?

3        A.   Yes, I believe so.

4        Q.   Did you make it a practice of going around and

5    telling your professors, hey, I don't want to be a part of

6    an adulteress affair?

7        A.   No, no.

8        Q.   Did you tell any other professor, hey, I'm dating

9    somebody, I don't want to fool around or have any

10   hanky-panky?

11       A.   No, no.

12       Q.   Did you ever ask the defendant to become involved

13   in a relationship with you?

14       A.   No.

15       Q.   And did the defendant's position at ISU make you

16   feel like you had to comply with his request that day at his

17   house, April 22nd?

18       A.   I believe so, yes.

19            MS. FOSTER:  Thank you.  I have nothing further.

20            THE COURT:  Mr. Prior.

21            MR. PRIOR:  Thank you, your Honor.

22                    RECROSS EXAMINATION

23                    BY MR. PRIOR:

24       Q.   Now, directing your attention to when you reported

1   to the police officer about the incident in the car, do you

2   remember telling police officer that -- in the car that you

3   allowed Dr. Forbes to kiss you?

4        A.   I don't remember if I said that, no.

5        Q.   Do you remember telling the police officer that in

6   the car you allowed him to fondle your breasts underneath

7   your shirt?

8        A.   Underneath, no.

9        Q.   Right.  Now, you also indicated that just now that

10  it was -- it wasn't until after Epiphany Catholic Church

11  paid you for the gig that Professor Forbes became more

12  annoying as far as you owe me, you owe me, you owe me; is

13  that correct?

14       A.   More so after he gave me the check, yes.

15       Q.   Okay.  And so they -- the gig was on April 15th

16  and 16th, and the 16th being Easter Sunday of 2006, correct?

17       A.   Uh-huh.

18       Q.   And do you remember when -- well, actually, I

19  believe you testified that he didn't give you the check,

20  that you found the check --

21       A.   He put it on his door for me.

22       Q.   Okay.  Do you remember when that was?

23       A.   I do not, no.

24       Q.   Okay.  But it would have to be after Sunday,

1    Easter Sunday, correct?

2        A.   It's possible.  It could have been before.  I

3    don't know for sure whether it was right before or right

4    after.  Could have been after.

5        Q.   Traditionally, on these other gigs for Epiphany,

6    did you get paid before you did the gig?

7        A.   I don't remember.  I don't remember.

8        Q.   You don't remember.  You indicated it could have

9    been after Easter Sunday?

10        A.   It could have been, yes.

11        Q.   And sometime between Easter Sunday the 16th and

12    the 22nd you decided that you would go ahead and baby-sit

13    for Dr. Forbes, correct?

14        A.   I'm not sure when I said that I would baby-sit for

15    him on the 22nd.

16        Q.   Well, you baby-sat on the 22nd, correct?

17        A.   I did, yes.

18        Q.   So sometime between the 16th and 21st you'd have

19    to agree to baby-sit, correct?

20        A.   It could have been before the 16th.  I don't

21    remember.

22        Q.   Do you think it was before the gig?

23        A.   I don't remember.

24            MR. PRIOR:  No further questions.

1    THE COURT:  Okay.  Ms. Foster.

2    MS. FOSTER:  I have nothing further.

3    THE COURT:  Thank you, ma'am.  You're excused.

4    THE WITNESS:  Thank you.

5    THE COURT:  Is she released -- is she under

6  subpoena?

7    MS. FOSTER:  Yes.

8    THE COURT:  She's released from her subpoena.

9    All right, thank you.

10    THE WITNESS:  Thanks.

11    MS. FOSTER:  Judge, my next witness -- if you want

12  to have any more testimony today, I leave that to the

13  Court's discretion -- would be Dr. Jim Major who is at his

14  office at the university.  I can call and have him here in

15  the next 15 minutes.  I'll leave that up to the Court's

16  discretion.  He's a relatively short witness.  I don't

17  anticipate it taking long.  I know you have another

18  sentencing hearing scheduled for 3:00.

19    THE COURT:  I don't know if they are here yet or

20  not.

21   (Whereupon an off-the-record discussion transpired.)

22    THE COURT:  What do you want to do?

23    MR. PRIOR:  That's fine with me, your Honor.

24    THE COURT:  Well, you mean to recess?

1          MR. PRIOR:  No, we're ready -- yeah, we could --

2     if you want to recess that's fine.

3          THE COURT:  Well, I mean, she's going to have to

4     call the witness.  I could do the sentencing hearing and

5     then we could continue with the evidence if you wanted to do

6     that.  Is that the only other witness you have for today?

7          MS. FOSTER:  For today it would be, yes.

8          THE COURT:  And then you have some more?

9          MS. FOSTER:  I just have one more, Don Knapp, who

10    is the officer that was in charge of the investigation, and

11    he's going to be lengthier because there is a taped

12    interview that was conducted with the defendant.

13         THE COURT:  And how long do you expect --

14         MS. FOSTER:  Dr. Major?

15         THE COURT:  -- Dr. Major to testify?

16         MS. FOSTER:  Not long at all.  I -- I don't have

17    much to ask.  I guess I can't speak for Mr. Prior.

18         MR. PRIOR:  Your Honor, I believe Captain Knapp

19    has been out there all afternoon.

20         MS. FOSTER:  He left because he was feeling ill.

21         MR. PRIOR:  Well, we were hoping we could get this

22    done, at least the State's part, today.

23         THE COURT:  Well, I don't think that's going to

24    happen.

110

1          MS. FOSTER:  The taped interview of the defendant

2     himself is approximately 45 minutes long.  That's just one

3     part of Captain Knapp's testimony.

4          MR. PRIOR:  All right.  If he's ill, he can't be

5     here, but should we just release our witnesses?

6          THE COURT:  You can, yeah, I think so.

7          MR. PRIOR:  Before I do that, we better get

8     another date.  I don't know if we want to do that after your

9     sentencing hearing.  That's fine with me.  I'm flexible.

10          THE COURT:  We can discuss a date right now.  I

11     don't have any problem with that.

12          MR. PRIOR:  If I tell my witnesses --

13          THE COURT:  Can we get this done in another half

14     day?

15          MS. FOSTER:  I think so.  That was by far my

16     lengthiest witness, and I didn't anticipate it being that

17     lengthy.

18          Mr. Bennett just indicated to me that on his case,

19     the sentencing, the defense has two witnesses.

20          THE COURT:  Oh.

21          MS. FOSTER:  Do you want counsel to speak to how

22     long he thought it might take?

23          THE COURT:  Yeah, how long do you think your

24     evidence might take in the sentencing hearing?

1          MR. SHEEHAN:  Judge, my guess is that it would

2     probably take about 45 minutes.

3          THE COURT:  Okay.

4          MR. SHEEHAN:  Maybe an hour.

5          THE COURT:  Let's just get a new date.

6          MS. FOSTER:  Okay.

7          THE COURT:  What's the best guess on how much more

8     time you have?

9          MR. PRIOR:  More than half a day now?

10         MS. FOSTER:  More than half a day?

11         MR. PRIOR:  Well, my witnesses are -- I think

12     might take the stand and it might be a little bit probably

13     as long as Megan with cross examine and everything.

14         MS. FOSTER:  I think I could finish my case in an

15     hour and a half.  Not that that helps much.

16         MR. PRIOR:  Might go a half a day.

17         THE COURT:  I mean, to get that much time,

18     actually looks like I've got -- I've got the morning of

19     December 18th.

20         MR. PRIOR:  December 18th.

21         THE COURT:  Yeah.  I got the entire morning.  You

22     know what, I've also got almost the entire -- I just have

23     one plea hearing on the 17th.

24         MR. PRIOR:  I have the 17th.

1          MS. FOSTER:  I can do that.

2          THE COURT:  Maybe we can do that.

3          MS. FOSTER:  Okay.

4          THE COURT:  I might even reserve another.

5          MS. FOSTER:  The morning?

6          THE COURT:  The morning of the 18th.

7          MS. FOSTER:  Tentatively?

8          THE COURT:  Just tentatively in case this goes

9   over, because I'd like to get this completed.

10         MR. PRIOR:  Okay.

11         THE COURT:  All right.  We're going to just

12  continue this bench trial to Monday, December 17th, at 9:00.

13         MS. FOSTER:  Your Honor, I'd -- I'm preparing a

14  order continuing subpoenas for both the State and for the

15  defense.

16         MR. PRIOR:  Judge, this is just something I'm

17  thinking of.  After we do all this, what if I went out and

18  visit with Jane, and what if we would stipulate to what our

19  next two witnesses would say and we can at least be done

20  with her case.  If she doesn't want to do that -- I think we

21  talked about maybe stipulations.

22         THE COURT:  Well, she wants to play the interview,

23  too.

24         MS. FOSTER:  Yeah, which is 45 minutes.

1           MR. PRIOR:  Okay.

2           THE COURT:  I suppose if you give me the interview

3  before the next trial date, I could look at it.  I mean,

4  talk about that.  I've done it in a couple other cases.  See

5  what you want to do.

6           MR. PRIOR:  Okay.

7           THE COURT:  That would be a possibility.

8  Eliminate about 45 minutes of court time.

9           MS. FOSTER:  I would have no problem with that,

10  but I'll talk to Mr. Prior about it.

11           THE COURT:  Okay.  And I'll -- I'm just going to

12  put a note do not set anything on the 18th.

13           MR. PRIOR:  All right.

14           MS. FOSTER:  I can go make two copies of that.

15           THE COURT:  Ms. Foster, can I get that tape back?

16           MS. FOSTER:  Oh, it's right in here.  Yes, I'm

17  sorry.

18

19      WHICH WERE ALL THE PROCEEDINGS REQUESTED TO BE

20        MADE OF RECORD IN THIS CAUSE ON SAID DATE

21

22

23

24

CERTIFICATE

1

2          I, Amy J. Jennings, Official Court Reporter in and

3    for the County of McLean and State of Illinois, Eleventh

4    Judicial Circuit, do hereby certify the foregoing to be a

5    true and accurate transcript of the proceedings had in the

6    before-entitled cause on said date.

7

8          Dated this _4th_ day of _March_,

9    2007.

10

11

12

13

14    _____

15          AMY J. JENNINGS, RPR, CSR
             Official Court Reporter

16          IL CSR No. 084-004135

17

18

19

20

21

22

23

24