1　　　　　**IN THE UNITED STATES DISTRICT COURT**

2　　　**FOR THE CENTRAL DISTRICT OF ILLINOIS**
　　　　　　　　　　**PEORIA DIVISION**

3　MEGAN HUNT,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
4　　　　　　　　Plaintiff,　　)
　　　　　　　　　　　　　　　　　　)
5　vs.　　　　　　　　　　　　　)　No. 07-1095
　　　　　　　　　　　　　　　　　　)
6　MICHAEL FORBES and ILLINOIS )
　　STATE UNIVERSITY,　　　　　)
7　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants. )

8

9　　　　　　**DEPOSITION OF DONALD KNAPP**

10　　　　　　　The deposition of Donald Knapp, a
　　witness called at the instance of Plaintiff taken on
11　December 15, 2009, at 1:30 p.m., at the offices of
　　Illinois State University, Normal, Illinois, before
12　Holly A. Schmid, Notary Public and Certified Shorthand
　　Reporter, CSR No. 084-98-254587 for the State of
13　Illinois, pursuant to notice.

14

　　　　　　　　**A P P E A R A N C E S**

15

　　**MR. RALPH D. DAVIS**
16　The Janssen Law Center
　　Attorney (s) at Law
17　███████████
　　Peoria, IL 61602
18　(309) 676-2341
　　In behalf of the Plaintiff;

19

　　**MS. SARAH R. KERLEY**
20　Assistant Attorney General
　　Attorney (s) at Law
21　████████████████eet
　　Springfield, IL 62706
22　(217) 785-4555
　　In behalf of the Defendant.

23

```
1              I N D E X

2

3  EXAMINATION                              PG.

4  Conducted by Mr. Davis:                    4

5  Conducted by Ms. Kerley:                  32

6

7              E X H I B I T S

8

9  IDENTIFICATION                           PG.

10 Deposition Exhibits Nos. 1 through 5:     35

11 ***All exhibits were retained by the court reporter.

12

13

14

15

16

17

18

19

20

21

22

23
```

1           IT IS STIPULATED AND AGREED by and

2    between Counsel for Plaintiff and Counsel for Defendant,

3    that the deposition of Donald Knapp be taken pursuant to

4    Federal Rules of Civil Procedure by and on behalf of the

5    Plaintiff on December 15, 2009, at the Illinois State

6    University, Normal, Illinois, before Holly A. Sutton, a

7    Notary Public, that the issuance of notice is waived and

8    that this deposition may be taken with the same force

9    and effect as if all Federal Rules had been complied

10   with.

11          IT IS FURTHER STIPULATED AND AGREED

12   that any and all objections to all or any part of this

13   deposition are hereby reserved and may be raised on the

14   trial of this cause; and that the signature of the

15   deponent is not waived.

16          Donald Knapp produced, sworn and

17   examined on behalf of the Plaintiff, testified and

18   deposed as follows:

19

20

21

22

23

```
 1                    EXAMINATION

 2               BY MR. DAVIS:

 3        Q.    Would you state your full name and spell

 4  your last name, please?

 5        A.    My name is Donald Knapp, K-N-A-P-P.

 6        Q.    And what is your business address?

 7        A.    ███████████, Normal, Illinois.

 8        Q.    What is your occupation?

 9        A.    I'm a captain with the police department

10  at ISU.

11        Q.    How long have you been a captain at ISU?

12        A.    I have been a captain 10 to 15 years.  I

13  have been employed for 38.

14        Q.    In September of 2005, what position did

15  you hold at ISU?

16        A.    Captain.

17        Q.    Is there another captain by the name of

18  Keith Gehrand?

19        A.    There was at the time.  He's since

20  retired.

21        Q.    Can you give me an idea of the sense of

22  the organization structure in the ISU police?

23        A.    At that time, Keith Gehrand was in charge
```

1   of patrol.  I was in charge of investigation, and we

2   both reported to a chief of police.

3           Q.    Who was the chief of police at that time?

4           A.    Ron Swan, Ronald Swan.

5           Q.    Is Ronald Swan still in the position?

6           A.    He is.

7           Q.    He was also in the position in 2005?

8           A.    Yes, he was.

9           Q.    We are here because of a matter involving

10  a faculty member by the name of Michael Forbes, but I'm

11  going to start talking about some issues that may have

12  occurred earlier.  This is your Bates number 297.

13  (Whereupon, a conversation occurred off the record.)

14              MS. KERLEY:  We are going to call that Knapp

15  1.

16              MR. DAVIS:  I will just put it Exhibit

17  No. 1.

18              BY MR. DAVIS:

19          Q.    I'm going to show you a letter previously

20  identified as Plaintiff's Exhibit No. 1.  Would you look

21  at it, please?

22          A.    Yes, I'm familiar with it.

23          Q.    Do you recognize that letter?

1     A.     I do.

2     Q.     And you have recollection of reading that

3 letter?

4     A.     I have.

5     Q.     How did you become aware of that letter?

6     A.     I first saw this letter during my

7 investigation in -- would have been '06, I believe, when

8 the Affirmative Action Office provided us with their

9 previous investigations of which this was a part.

10    Q.     Okay.

11    A.     I didn't see it.  At the time it came

12 through Captain Gehrand to Shane McCreary.

13    Q.     Now, when -- now, were you given a copy of

14 this in your function?

15    A.     It was in my case file, yes.

16    Q.     When you received that information that is

17 contained in that letter, did you take any specific

18 action in your official capacity?

19    A.     By the time I saw this letter, I was

20 already investigating the matter for which Forbes was

21 eventually indicted.  I saw this in the course of my

22 criminal investigation in May of '06.

23    Q.     All right.  Well, then let's go to where

1  you were first then involved in this case in any fashion

2  at all.  Do you have recollection of the -- of when you

3  were called in to this case?

4       A.    Yes.

5       Q.    When was that?

6             MS. KERLEY:  I'm sorry.  For

7  foundational purposes and just for clarity of the

8  record, "this case"?

9             MR. DAVIS:  This case being the case

10 against Michael Forbes involving Megan Hunt.

11            MR. DAVIS:

12      Q.    Do you remember the date of your first

13 involvement?

14      A.    I think it was May 2nd, which was

15 inaccurately labeled April 2nd in the first report I

16 wrote, but I believe May 2 is the actual date.  I would

17 have to see the file to know for sure.

18      Q.    But it would be fair enough to say on or

19 about --

20      A.    Yes, it would.

21      Q.    -- May --

22      A.    That's of '06.

23      Q.    Okay.  May 2, 2006?

1      A.    Yes.

2      Q.    Now, when you made reference to a report

3 dated April, I was about to provide you with a report

4 that was produced to discovery here dated -- this would

5 be starting with your Bates number 298.

6           I'm going to hand you a group of

7 documents, and it's my understanding that these go

8 together.

9           MS. KERLEY:  Are you marking it or

10 just --

11          MR. DAVIS:  I will.  It would be

12 Exhibit No. 2.

13          MS. KERLEY:  What's the last page of

14 that exhibit?

15          MR. DAVIS:  The Bates number.

16          THE WITNESS:  306.

17          BY MR. DAVIS:

18     Q.    Do you recognize those documents?

19     A.    I do.

20     Q.    Did you prepare any of those documents?

21     A.    No.

22     Q.    So was this something that you also

23 received in your packet when you were brought in on the

1  case or soon thereafter?

2      A.    Soon thereafter, yes.

3      Q.    Because the date on that one is May 5th of

4  2005?

5      A.    Of '05.  This was a year earlier.

6      Q.    So this would have been in the packet

7  provided to you?

8      A.    Yes.

9            MS. KERLEY:  Let's go off the record.

10  (Whereupon, a conversation occurred off the record.)

11           BY MR. DAVIS:

12     Q.    I'm going back to -- Exhibit No. 2 was in

13  the packet.  I just want to -- this is a question mark

14  at the end of this.  Was Exhibit No. 2 in the packet of

15  materials that was provided to you at the time that you

16  came upon the case around May 2nd, 2006?

17     A.    Yes.

18     Q.    Now, as a result of those materials, plus

19  the materials that were generated by the Office of

20  Civil --

21           MS. KERLEY:  Diversity and Affirmative

22  Action.

23           BY MR. DAVIS:

1      Q.      -- Diversity and Affirmative Action, Mr.

2  McCreary's office, does that comprise the bulk of the

3  materials that you received when you came on the

4  investigation in May 2 of 2006?

5      A.      Ask that again, please.

6      Q.      The exhibits that are before you, Exhibit

7  Nos. 1 and 2, plus the materials that were generated by

8  Shane McCreary's office, did that comprise the bulk of

9  the materials that were provided to you when you came

10  upon the case in May 2nd, 2006?

11      A.      You are differentiating material from

12  testimony from witness interviews?

13      Q.      Yes.

14      A.      Yes.  Yes to your question.

15      Q.      I am going to hand you something that has

16  been identified previously as Exhibit No. 3.

17              MS. KERLEY:  Can we go off the record

18  for a minute?

19  (Whereupon, a conversation occurred off the record.)

20              BY MR. DAVIS:

21      Q.      On or around May 2nd of 2006 when you came

22  upon the case, did the Exhibits Nos. 1 and 2 that are

23  before you, plus material generated by Shane McCreary's

1 office constitute the bulk of the materials that were

2 given to you at the outset of your involvement?

3          A.    Yes.

4          Q.    I'm now going to hand you a document

5 previously identified as Exhibit No. 3, and I would like

6 you to look it over.  Do you recognize that document?

7          A.    I do.

8          Q.    What do you recognize it as?

9          A.    This is -- these are the first few pages

10 of the initial -- of the ISU police report number

11 2006-06-356.  It describes my initial involvement in

12 this case, and it also describes an interview done by

13 another officer with one of the people we interviewed.

14          Q.    Now, as you look at that, there's a

15 lengthy report that is a part of that document, correct?

16          A.    Yes.

17          Q.    Did you review that report before you came

18 here today?

19          A.    I did.

20          Q.    Rather than for us to go through that

21 point by point, in the interest of brevity, is there

22 anything that you would correct from that report as you

23 sit here today?

1      A.     As I mentioned a minute ago, April 2nd,

2  2006, was actually May 2nd, 2006, and we discovered that

3  somewhere in the past.  Other than that, I don't think

4  so.  I believe all the narrative is accurate.

5      Q.     Would you add anything to that report as

6  you sit here today?

7      A.     I don't believe so.

8      Q.     I'm going to hand you a group of documents

9  previously identified as Group Exhibit No. 4, and there

10  are a lot of pages, and for your purposes, it's numbers

11  333 through 359.  Would you look over those documents?

12      A.     Obviously somebody's notes.

13      Q.     That's what I ask.  Do you recognize that?

14      A.     I do not.

15      Q.     You recognize nothing of that?

16      A.     No.  Well, I can -- I recognize some of

17  the content, but --

18      Q.     Okay.  Do you recognize the handwriting?

19      A.     No.  I have never seen these documents

20  before.

21      Q.     What I would like to do then today as far

22  as spending our time, could you, generally, describe the

23  activities that you performed in your investigation into

1 Michael Forbes? And I mean that generally, interviews,

2 documents, inspections, and the like. Do you understand

3 my question?

4          A.     Yes, I think I do. I first became aware a

5 day or two, I would say, prior to the date on the

6 initial police report. I met in Shane McCreary's office

7 with Mr. McCreary, with Megan Hunt and with another

8 female student, a friend of Megan's, and I'm not exactly

9 sure -- I think her last name is Richter, but I would

10 have to make sure that's who it was. There was some

11 other female student friend of hers. We had a -- I

12 don't know -- 30-minute discussion, perhaps, in which I

13 was given the basic story that Megan had, apparently,

14 told Mr. McCreary. There was discussion about options.

15 There was discussion about what Megan did or did not

16 want to do, and my role I would characterize as

17 providing information, providing perhaps insight and

18 providing options, available choices. Then on May 2nd,

19 McCreary brought her to my office, and I did the initial

20 interview with her. From that point, forward, the

21 police reporting started. Generally speaking, we

22 interviewed her. We interviewed a few people, names

23 that she gave us. As you have alluded, Mr. McCreary

1 provided me with that stack of -- those documents that

2 we talked about earlier, which, basically, outlined two

3 investigations previously done by ODAA.

4                    We then -- I then, with the assistance

5 of the state's attorney, obtained an order, and we did

6 surreptitious phone calls and an in-person meeting

7 between Megan Hunt and Dr. Forbes.  There were a few

8 more interviews, I believe, of various different

9 potential witnesses.  Forbes was indicted.  A trial was

10 set.  Then later, weeks, months later, at the request of

11 the state's attorney, we went back and did some more

12 interviews in preparation for trial, and we went to

13 trial.

14       Q.    So were you involved directly on any of --

15 scratch that.  Were you aware of any activity involving

16 Megan Hunt wearing what is called a wire?

17       A.    Yes.

18       Q.    Were you involved in the monitoring of the

19 conversation?

20       A.    I was.

21       Q.    So were you involved in every one of the

22 conversations as a listener --

23       A.    I was.

1      Q.     -- between -- just let me get the question

2  out.  Between Megan Hunt and Michael Forbes?

3      A.     I was, yes.

4      Q.     So that information is contained in the

5  various -- I'm not going to go through all that today --

6  in the various criminal processes that were against

7  Mr. Forbes and came to light in testimony, as well as

8  other documents, including police reports, correct?

9      A.     Yes.

10     Q.     Did you prepare any special police reports

11 for any entity outside of Illinois State University?

12     A.     Yes.

13     Q.     What were those reports and to whom?

14     A.     The one -- the police report that's got

15 the number 2006-06-356 on it was provided to the McLean

16 County State's Attorney.

17     Q.     That would have been -- do you remember

18 what the date on that was?

19     A.     That's this document, May 5th -- May 2nd

20 of `06.

21     Q.     That's the one we have been referring to?

22     A.     That's the one we've been referring to.

23     Q.     Which appears as Exhibit No. 3?

1      A.     That and more.

2      Q.     That and more.  What else was "and more"

3   provided to -- under your pen, to sources outside of

4   Illinois State University?

5      A.     It was this document, plus the packet

6   containing the two ODAA investigations, which you were

7   talking about earlier, plus there are a few more --

8   there are a few more ISU police report supplements after

9   that in what I call my file.

10     Q.     Okay.  And that was produced in discovery

11  that I have since torn up.

12            MS. KERLEY:  Just off the record real

13  quick.

14  (Whereupon, a conversation occurred off the record.)

15            MR. DAVIS:  I'm not going to make a special

16  exhibit, but we're going to identify this as the Bates

17  numbers?

18            MS. KERLEY:  Yeah, that's fine.

19            MR. DAVIS:  I'm going to hand you a

20  group of documents that contain Bates numbers of 11

21  through 84 --

22            MS. KERLEY:  Nine.  It should be nine

23  through --

1      MR. DAVIS:  Excuse me, 9 through 84,

2  and I would like you to just look through those.

3           BY MR. DAVIS:

4      Q.    This is not identified by an exhibit

5  number, but rather, by Bates numbers of 9 through 84.

6  Do you recognize that as the entire report as you

7  provided to the state's attorney?

8      A.    I believe so, yes, but I can't, from

9  memory, certify 100 percent that there isn't a missing

10  page in here, but this -- beginning and end and all

11  things in between, this appears to be what I call my

12  file.  Unless somehow somebody has lost a page or two,

13  yes.

14      Q.    Now, as you sit here today, do you have an

15  independent -- I'm going to put this all back together

16  again, so I have -- do you have an independent

17  recollection of Michael Forbes, what he looks like?

18      A.    You know what, not really, although I'm

19  sure I would know him if I saw him again.  I met the man

20  once, and I sat in court with him.

21      Q.    When you say you met the man once, was

22  that for an interview?

23      A.    Yes.

1    Q.    I'm going to present to you -- where did I

2  put it, as I have torn everything apart -- a document

3  produced to us in discovery, Bates number 281, and it's

4  an undated newspaper article apparently from the

5  Pantagraph.  And I'm going to hand that to you and

6  identify that as Exhibit No. 5.  First, look it over.

7    A.    Yes.

8    Q.    I would like to ask you a question.  In

9  the article, the second to last paragraph, the reporter

10 quotes you saying, "In the performance of his job as a

11 music teacher, he got this student to do something he

12 shouldn't have."  Do you remember telling that to a

13 reporter?

14   A.    I don't actually remember it, but I have

15 no reason to believe it's inaccurate.

16   Q.    In forming your statement that, "In the

17 performance of his job as a music teacher," can you

18 explain to me as you sit here today what you meant by

19 that?

20   A.    At that point, I knew what he was charged

21 with, one of which was official misconduct.  That's an

22 element of the offense that is tied to his employment,

23 and that would have been my thinking at the time.

1    Q.   By the time that you became aware of the

2  complaint against Michael Forbes, had you been priorly

3  aware of any misconduct that Michael Forbes had been

4  charged of involving a Christina Blankenship at ISU?

5              MS. KERLEY:   Objection, just to the

6  use of the word "charged" for foundation purposes.   I

7  don't know if you mean criminally charged or allegations

8  made or administrative charges.

9              BY MR. DAVIS:

10    Q.   I will clarify that.   Prior to being

11  brought in on the case on May 2nd, 2006, were you aware

12  of any complaints of misconduct by Professor Forbes

13  brought by a Christina Blankenship?

14    A.   At the time prior to May 2nd, I was not.

15    Q.   Same question, prior to May 2nd or

16  thereabouts, were you aware of any complaints brought by

17  Anna Torkelson from Minnesota brought against Michael

18  Forbes?

19    A.   I certainly was not aware of the substance

20  of it.   The letter sent to Captain Gehrand, I may have

21  been aware of that letter back when he passed it on, but

22  only incidentally, if at all, and I never really saw

23  that, either, and got the details of the rest of the

1  story until this began on May 2nd.

2       Q.    As a matter of police practice at Illinois

3  State, apparently, this would not involve you, so that's

4  why I'm asking you about police practices of Illinois

5  State.  If Captain Gehrand was made aware of a complaint

6  brought by a student at a university in another state

7  against a professor at Illinois State University, what

8  responsibilities does Captain Gehrand have with respect

9  to following up that complaint?

10              MS. KERLEY:  Objection, speculation,

11  lack of foundation.  You can go ahead and answer.

12              THE WITNESS:  I don't know that

13  there's a clearcut answer to that, but I know quite a

14  bit about what was actually done in this case, and I

15  support it.

16              BY MR. DAVIS:

17       Q.    And I'm looking for procedure.  What would

18  be the appropriate procedure for a captain who had

19  received information from a police force in another

20  state involving a student at another school, but

21  complaining against an ISU professor?

22       A.    I believe, and I believe, for the record,

23  Captain Gehrand did the proper thing.  We would have --

1  "we," the ISU police, would have no responsibility, I

2  would argue, to intercede in an alleged crime that

3  happened in Minnesota.  However, given the university

4  nexus, when Captain Gehrand would have this information,

5  I believe he appropriately passed it on to Diversity and

6  Affirmative Action, which is the wing of the university

7  that would investigate things such as sexual harassment

8  that would have ties to the academic side of the

9  university and so on and so forth.

10             Did I answer your question?

11        Q.    Yes, and I'm going to ask a few more.

12  Would there be any heightened sensitivity to the conduct

13  or whereabouts of Dr. Forbes on campus after a complaint

14  such as the one brought by Anna Torkelson was brought?

15             MS. KERLEY:  Objection; foundation,

16  and perhaps I just don't understand your question.  Do

17  you mean heightened sensitivity by ISU PD, was

18  the police department --

19             MR. DAVIS:  Well, I will give an

20  example of what I mean.

21             BY MR. DAVIS:

22        Q.    In other police work, if there's a

23  domestic dispute at a certain house a couple of times,

1 that house -- you know, they say, "Oh, the Smiths are at

2 it again." They are sensitive, and if somebody calls,

3 they know that it's more likely that there's something

4 going on than not, so you would respond with knowledge.

5 When there are complaints brought like the St. Peters

6 Police about Anna Torkelson and Michael Forbes, does

7 that create any other -- again, I'm using the words

8 "heightened sensitivity," but in that sense, do you just

9 sort of maybe keep more of an eye out or keep your ears

10 open more?

11        A.    I think the appropriate answer to that is

12 maybe.  Well --

13        Q.    I'm talking about procedure.

14        A.    Yeah, I think the appropriate answer is

15 maybe.

16        Q.    Now, that's just from a general

17 standpoint.

18        A.    Right.

19        Q.    Now, specifically, to Michael Forbes, are

20 you aware of any of that -- and I'm using, for lack of

21 no better term, heightened sensitivity to Michael

22 Forbes' conduct on campus with respect to female

23 students.

1    A.    I would say, from my memory, no, there

2 wasn't any heightened attention paid to Michael Forbes

3 based on this document by the ISU police, that

4 qualifier.

5    Q.    Okay.  Here is where I'm going to be

6 asking some questions, and I do not want to go into any

7 area that will violate anybody's privacy, so I don't

8 need names or anything like that, but are you aware of,

9 in your capacity as a captain of the ISU police force,

10 other incidences of faculty who have been alleged to

11 have -- scratch that -- were alleged to have sexually

12 harassed a student?

13    A.    Am I personally aware of any other

14 allegations --

15    Q.    Against other professors.

16    A.    Any faculty who have allegedly harassed

17 students?

18    Q.    Sexually, yes.

19    A.    Sexually harassed students.  Yes.

20    Q.    And were you aware of those prior to April

21 of 2006?

22    A.    I believe so.

23    Q.    Now, in those circumstances -- again, I

1  don't need names or places, but in those circumstances

2  when there were allegations brought against a faculty

3  member for sexual harassment, was there any heightened

4  scrutiny upon that faculty member by the ISU police?

5          A.    Not that I'm aware of.

6          Q.    I'm looking for were there any special

7  cases?

8          A.    Not that I can think of.

9          Q.    Were there any circumstances prior to

10  April of 2006 where the administration of the

11  university, in any of its forums, requested, to your

12  knowledge, of the ISU police to keep a closer watch on

13  any faculty member for that faculty member's conduct

14  with respect to harassment of students?

15          A.    Not that I can remember.  That's my

16  answer, not that I can remember.

17          Q.    In this case, now Dean Major, and I guess

18  Department Head Chair Major, testified that he gave

19  special instructions to Michael Forbes with his conduct

20  regarding students and parties and alcohol.  Are there

21  occasions when faculty -- well, higher-ranking faculty

22  members, department chairs or deans, inform the ISU

23  police of any restrictions in conduct of any of the

1  faculty members that you know of?

2       A.    No, not that I know of.

3       Q.    Is there anything in procedures that if

4  such a thing were to arise, that there would be a

5  procedure to follow inside the ISU Police Department?

6       A.    Certainly nothing formal.  If anything

7  like that were to happen, it would have to be -- I don't

8  know what the proper term is -- unofficial, off the

9  record and unreported.  I guess I could see a situation

10 where if one of the members of the police department had

11 some information, and it was discussed informally, that

12 could result in either several or one or more people

13 having increased awareness, but there's no way to report

14 that.  There's no way to document that.  There's no

15 process for implementing that or recording it.  Is

16 that --

17      Q.    Well, you tell me.  So if there is any of

18 that sort of heightened scrutiny under those

19 circumstances, it would be more or less passed like

20 around the water cooler I guess is what you're saying?

21      A.    I think that's fair, yes.

22      Q.    Now, in your time at ISU and prior to

23 2006, do you have recollection of any informal process

1  like that at work with respect to a faculty member?

2  Again, don't tread on anybody's privacy rights.

3      A.    Well, if I understand your question, yes,

4  I think I do.  I will describe --

5            MS. KERLEY:  Let's take a break.  Let

6  me make sure that we are not going to run afoul of any

7  problems.

8  (Whereupon, a conversation occurred off the record.)

9            BY MR. DAVIS:

10     Q.    We're back on, and you are about to answer

11 the question.

12     A.    Yes, I will give an example and see if

13 this answers your question.  I became aware, in one

14 situation I can think of at this moment, of an

15 allegation that a faculty member was inappropriately

16 sexually involved or making passes at, for lack of a

17 better word, a female student.  Discussion with -- I

18 don't even remember the administrator I was talking to,

19 but it was an administrator I'm pretty sure.  The

20 discussion was, well, if there is an allegation that

21 this faculty member is committing a crime, we need to do

22 a report and investigate the crime.  Otherwise, this

23 needs to go to Shane McCreary at Affirmative Action

1 because that's the bright line demarcation between what
2 we do and what ODAA does.

3              So in your specific question, yes,
4 there is, at least, one other case that I remember
5 having information, me, personally, having information
6 of an allegation of what certainly would have been
7 sexual harassment, I believe, but to your -- what I
8 believe is your underlying question, but the police
9 department didn't get involved.  We funneled it to the
10 part of the university that's tasked with investigating
11 those things.

12         Q.    That would be what's now Shane McCreary's
13 office?

14         A.    What's now Shane McCreary's office,
15 correct.

16         Q.    I also realize that, since we took a
17 break, that I have been referring to Christina
18 Blankenfeld as Blankenship, so...

19              MS. KERLEY:  I think you actually got
20 it right.

21              MR. DAVIS:  You think I got it right?

22              MS. KERLEY:  I do.

23              MR. DAVIS:  Well, in case that I

1  didn't, so we are all on the same page, it's Christina

2  Blankenfeld.

3              MS. KERLEY:  Does that change any of

4  your answers?

5              THE WITNESS:  No, it does not.

6              BY MR. DAVIS:

7        Q.    Prior to May of 2006, had you been

8  involved in any investigation work on allegations

9  brought by Christina Blankenfeld at any time?

10       A.    No.

11       Q.    So you became aware of Christina

12  Blankenfeld for the first time in Megan Hunt's case?

13       A.    Yes.

14       Q.    I'm going to ask this question at the

15  recommendation of my honorific counsel.  What are your

16  plans with respect to employment at Illinois State

17  University in the near future?

18       A.    I intend to retire sometime after -- at

19  the end of or near the end of this spring semester,

20  which would be late April, May, or early June of 2010.

21       Q.    Now, so I don't have to redact things

22  later on, I earlier asked you what your business address

23  is.  I'm going to ask you what your residential address

1  is, but I don't want a street name.  I just want a town

2  and a state.  Where do you reside?

3          A.    Goodfield, Illinois.

4          Q.    And does your phone appear in the phone

5  directory in that town?

6          A.    My home phone does.

7          Q.    I don't want your phone number, but. . .

8          A.    It does.

9          Q.    How long have you lived at that address?

10         A.    About 42 years.

11         Q.    Have you had, essentially, the same

12  telephone number?

13         A.    I have.

14         Q.    Do you have any plans to change your

15  address?

16         A.    I do not.

17         Q.    You can see we are getting near the end.

18               As we sit here today, do you have any

19  knowledge of other persons in the ISU Police Department

20  who would have knowledge from their own investigation of

21  the events of this case involving Michael Forbes other

22  than Captain Gehrand and yourself?

23         A.    There was a person who has since left.

1  He's now with Bloomington Police Department.  He was a

2  detective at the time.  His name is Timothy Carlton.  He

3  wrote, at least -- he did, at least, one interview in

4  that case.

5          Q.    Could you spell his last name?

6          A.    C-A-R-L-T-O-N.  There is a current

7  detective named Julie Sheppelman, S-H-E-P-P-E-L-M-A-N,

8  who entered some of the evidence in the case, who

9  contributed to the case file.  She not only is our

10 evidence handling person, but she works directly with me

11 on a daily basis.  She certainly would have been

12 familiar with most, if not all, of this investigation.

13 And, frankly, the way our -- the way the ISU police

14 system is designed, we didn't restrict this file, so any

15 officer who chose to read the file could have read it,

16 and I can't address how many did and didn't.

17         Q.    Well, I was asking for those who have

18 direct involvement.

19         A.    Timothy Carlton and Julie Sheppelman, for

20 sure, contributed to this, but it was under my

21 supervision.

22         Q.    It was funneled through you?

23         A.    Yes.

1    Q.    Their work, correct?

2    A.    Yes.

3    Q.    In the course of your work on this, other

4 than official meetings, did you have conversations with

5 either Dr. Major or any other faculty members about

6 Michael Forbes?  I don't want to count the official

7 meetings where all were gathered to give reports.

8    A.    I don't believe I had, no.  I don't

9 believe I did.  Faculty members are a pretty broad

10 definition, however.  Many administrators also teach.

11 Do you really mean any faculty member?

12    Q.    Yeah, I actually do, and so I'll tell you

13 what I'm looking for, and -- you know, were there

14 occasions that would not have had official sanction

15 where, for example, Dr. Major picked up the phone and

16 called you to say, "How is the investigation going?" or

17 things like that?

18    A.    Specifically, Dr. Major did not.  There

19 are other folks at the university who are in

20 administrative positions that -- like my boss' boss, the

21 assistant to the president, legal counsel.

22    Q.    I don't want to know about legal counsel.

23    A.    Well, okay.  Shane McCreary.  I cannot

1 tell you today that I didn't discuss any of this

2 investigation with other faculty members, but as I sit

3 here today, I can't give you an example of who I might

4 have talked to about it.

5      Q.    But you don't have any specific

6 recollection as you sit here today?

7      A.    That's correct.

8            MR. DAVIS:  Okay.  I think I'm done.

9            CROSS-EXAMINATION

10            BY MS. KERLEY:

11      Q.    I just have a couple.  With respect to

12 Timothy Carlton or Julie Sheppelman, would their reports

13 be contained within your case file, the Bates stamp 9

14 through 84 that you looked at earlier?

15      A.    Yes.

16      Q.    And during the questions where Mr. Davis

17 asked you about what procedure the department might

18 follow if an administrator notified them of restrictions

19 of a faculty member, to which you responded an informal

20 water cooler type procedure.  Do you recall those

21 questions?

22      A.    Mm-hmm.

23      Q.    Is that a yes?

1     A.    Yes, I do.

2     Q.    Directing your attention to that line of

3  questioning, that's really all speculation because you

4  have never been faced with an instance where any kind of

5  informal process of police work occurred, other than a

6  call from an administrator that you described, correct?

7     A.    Yes, that is correct.

8          MS. KERLEY:  I don't have any further

9  questions.

10         (Deposition Exhibit Nos. 1 through 5

11  were marked for identification.)

12

13

14

15

16

17

18

19

20

21

22

23

1 STATE OF ILLINOIS)

2 COUNTY OF ST. CLAIR)SS

3

4            I, Holly A. Schmid, a Notary Public in

5 and for the County of Williamson, DO HEREBY CERTIFY that

6 pursuant to agreement between counsel there appeared

7 before me on December 15, 2009, at the office of

8 Illinois State University in Normal, Illinois, Donald

9 Knapp, who was first duly sworn by me to testify the

10 whole truth of his knowledge touching upon the matter in

11 controversy aforesaid so far as he should be examined

12 and his examination was taken by me in shorthand and

13 afterwards transcribed upon the typewriter (but not

14 signed by the deponent, his signature having not been

15 waived by agreement of counsel) and said deposition is

16 herewith returned.

17            IN WITNESS WHEREOF I have hereunto set

18 my hand and affixed my Notarial Seal this 26th day of

19 December, 2009.

20

21     "OFFICIAL SEAL"        HOLLY A. SCHMID
       HOLLY A. SCHMID
22     NOTARY PUBLIC—STATE OF ILLINOIS    Notary Public -- CSR
       MY COMMISSION EXPIRES MAY 31, 2010

23                             084-98-254587

1 Megan Hunt
  vs. 07-1095
2 Michael Forbes, et al.

3      I, Donald Knapp, being first duly sworn, on oath
  say that I am the deponent in the aforesaid deposition
4 taken on December 15, 2009; that I have read the
  foregoing transcript of my deposition and affix my
5 signature to the same.

6                                    _____
                                     Donald Knapp
  State of _____
7 County of _____

8      IN WITNESS WHEREOF I have hereunto set my hand and
  affixed my Notarial Seal this _____ day of ____, 20___.
9

10                                   _____
                                     Notary Public
  Seal:
11

12
  (Schmid)
13

14

15

16

17

18

19

20

21

22

23

**'**

'05 [1] - 9:5
'06 [3] - 6:7, 6:22, 7:22

**0**

06 [1] - 15:20
07-1095 [2] - 1:5, 35:1
084-98-254587 [2] - 1:12, 34:23

**1**

1 [7] - 2:10, 5:15, 5:17, 5:20, 10:7, 10:22, 33:10
10 [1] - 4:12
100 [1] - 17:9
11 [1] - 16:20
15 [5] - 1:11, 3:5, 4:12, 34:7, 35:4
1:30 [1] - 1:11

**2**

2 [8] - 7:16, 7:23, 8:12, 9:12, 9:14, 10:4, 10:7, 10:22
2005 [3] - 4:14, 5:7, 9:4
2006 [12] - 7:23, 9:16, 10:4, 10:10, 10:21, 12:2, 19:11, 23:21, 24:10, 25:23, 28:7
2006-06-356 [2] - 11:11, 15:15
2009 [5] - 1:11, 3:5, 34:7, 34:19, 35:4
2010 [1] - 28:20
20___ [1] - 35:8
217 [1] - 1:22
26th [1] - 34:18
281 [1] - 18:3
297 [1] - 5:12
298 [1] - 8:5
2nd [13] - 7:14, 7:15, 9:16, 10:10, 10:21, 12:1, 12:2, 13:18, 15:19, 19:11, 19:14, 19:15, 20:1

**3**

3 [3] - 10:16, 11:5, 15:23
30-minute [1] - 13:12
306 [1] - 8:16
309 [1] - 1:18
32 [1] - 2:5
333 [2] - 1:17, 12:11
35 [1] - 2:10
359 [1] - 12:11
38 [1] - 4:13

**4**

4 [2] - 2:4, 12:9
42 [1] - 29:10

**5**

5 [3] - 2:10, 18:6, 33:10
500 [1] - 1:21
5th [2] - 9:3, 15:19

**6**

61602 [1] - 1:17
62706 [1] - 1:21
676-2341 [1] - 1:18

**7**

785-4555 [1] - 1:22

**8**

84 [4] - 16:21, 17:1, 17:5, 32:14

**9**

9 [3] - 17:1, 17:5, 32:13
9240 [1] - 4:7

**A**

academic [1] - 21:8
accurate [1] - 12:4
Action [5] - 6:8, 9:22, 10:1, 21:6, 26:23
action [1] - 6:18
activities [1] - 12:23
activity [1] - 14:15
actual [1] - 7:16
add [1] - 12:5
address [6] - 4:6, 28:22, 28:23, 29:9, 29:15, 30:16
administration [1] - 24:10
administrative [2] - 19:8, 31:20
administrator [4] - 26:18, 26:19, 32:18, 33:6
administrators [1] - 31:10
affix [1] - 35:4
affixed [2] - 34:18, 35:8
aforesaid [2] - 34:11, 35:3
afoul [1] - 26:6
afterwards [1] - 34:13
ago [1] - 12:1
AGREED [2] - 3:1, 3:11
agreement [2] - 34:6, 34:15
ahead [1] - 20:11
al [1] - 35:2
alcohol [1] - 24:20
allegation [3] - 26:15, 26:20, 27:6
allegations [4] - 19:7, 23:14, 24:2, 28:8
alleged [1] - 21:2, 23:10, 23:11
allegedly [1] - 23:16
alluded [1] - 13:23
AND [2] - 3:1, 3:11
Anna [3] - 19:17, 21:14, 22:6
answer [7] - 20:11, 20:13, 21:10, 22:11, 22:14, 24:16, 26:10
answers [2] - 26:13, 28:4
apart [1] - 18:2
appear [1] - 29:4
appeared [1] - 34:6
appropriate [2] - 20:18, 22:11, 22:14
appropriately [1] - 21:5
April [6] - 7:15, 8:3, 12:1, 23:20, 24:10, 28:20
area [1] - 23:7
argue [1] - 21:2

arise [1] - 25:4
article [2] - 18:4, 18:9
assistance [1] - 14:4
assistant [1] - 31:21
Assistant [1] - 1:20
attention [2] - 23:2, 33:2
attorney [3] - 14:5, 14:11, 17:7
Attorney [4] - 1:16, 1:20, 1:20, 15:16
available [1] - 13:18
aware [17] - 6:5, 13:4, 14:15, 19:1, 19:3, 19:11, 19:16, 19:19, 19:21, 20:5, 22:20, 23:8, 23:13, 23:20, 24:5, 26:13, 28:11
awareness [1] - 25:13

**B**

based [1] - 23:3
basic [1] - 13:13
basis [1] - 30:11
Bates [8] - 5:12, 8:5, 8:15, 16:16, 16:20, 17:5, 18:3, 32:13
became [1] - 13:4, 19:1, 26:13, 28:11
become [1] - 6:5
began [1] - 20:1
beginning [1] - 17:10
behalf [4] - 1:18, 1:22, 3:4, 3:17
better [2] - 22:21, 26:17
between [2] - 3:2, 14:7, 15:1, 17:11, 27:1, 34:6
Between [1] - 15:2
bit [1] - 20:14
Blankenfeld [4] - 27:18, 28:2, 28:9, 28:12
Blankenship [3] - 19:4, 19:13, 27:18
Bloomington [1] - 30:1
boss [1] - 31:20
boss' [1] - 31:20
Box [1] - 4:7
break [2] - 26:5, 27:17
brevity [1] - 11:21
bright [1] - 27:1

broad [1] - 31:9
brought [12] - 8:23, 13:19, 19:11, 19:13, 19:16, 19:17, 20:6, 21:14, 22:5, 24:2, 28:9
bulk [3] - 10:2, 10:8, 11:1
business [2] - 4:6, 28:22
BY [13] - 4:2, 5:18, 8:17, 9:11, 9:23, 10:20, 17:3, 19:9, 20:16, 21:21, 26:9, 28:6, 32:10

**C**

C-A-R-L-T-O-N [1] - 30:6
campus [2] - 21:13, 22:22
Campus [1] - 4:7
cannot [1] - 31:23
capacity [2] - 6:18, 23:9
captain [6] - 4:9, 4:11, 4:12, 4:17, 20:18, 23:9
Captain [8] - 4:16, 6:12, 19:20, 20:5, 20:8, 20:23, 21:4, 29:22
Carlton [3] - 30:2, 30:19, 32:12
case [22] - 6:15, 7:1, 7:3, 7:8, 7:9, 9:1, 9:16, 10:10, 10:22, 11:12, 19:11, 20:14, 24:17, 27:4, 27:23, 28:12, 29:21, 30:4, 30:8, 30:9, 32:13
cases [1] - 24:7
Center [1] - 1:16
CENTRAL [1] - 1:1
certain [1] - 21:23
certainly [3] - 19:19, 27:6, 30:11
Certainly [1] - 25:6
Certified [1] - 1:12
certify [1] - 17:9
CERTIFY [1] - 34:5
Chair [1] - 24:18
chairs [1] - 24:22
change [2] - 28:3, 29:14
characterize [1] - 13:16
charge [2] - 4:23, 5:1

charged [4] - 18:20, 19:4, 19:6, 19:7
charges [1] - 19:8
chief [2] - 5:2, 5:3
choices [1] - 13:18
chose [1] - 30:15
Christina [6] - 19:4, 19:13, 27:17, 28:1, 28:9, 28:11
circumstances [4] - 23:23, 24:1, 24:9, 25:19
Civil [2] - 3:4, 9:20
CLAIR)SS [1] - 34:2
clarify [1] - 19:10
clarity [1] - 7:7
clearcut [1] - 20:13
closer [1] - 24:12
committing [1] - 26:21
complaining [1] - 20:21
complaint [4] - 19:2, 20:5, 20:9, 21:13
complaints [3] - 19:12, 19:16, 22:5
complied [1] - 3:9
comprise [2] - 10:2, 10:8
conduct [5] - 21:12, 22:22, 24:13, 24:19, 24:23
Conducted [2] - 2:4, 2:5
constitute [1] - 11:1
contain [1] - 16:20
contained [3] - 6:17, 15:4, 32:13
containing [1] - 16:6
content [1] - 12:17
contributed [2] - 30:9, 30:20
controversy [1] - 34:11
conversation [6] - 5:13, 9:10, 10:19, 14:19, 16:14, 26:8
conversations [2] - 14:22, 31:4
cooler [2] - 25:20, 32:20
copy [1] - 6:13
correct [8] - 11:15, 11:22, 15:8, 27:15, 31:1, 32:7, 33:6, 33:7
Counsel [2] - 3:2
counsel [5] - 28:15, 31:21, 31:22, 34:6, 34:15
count [1] - 31:6

County [1] - 15:16, 34:5, 35:7
COUNTY [1] - 34:2
couple [2] - 21:23, 32:11
course [2] - 6:21, 31:3
COURT [1] - 1:1
court [2] - 2:11, 17:20
create [1] - 22:7
crime [3] - 21:2, 26:21, 26:22
criminal [2] - 6:22, 15:6
criminally [1] - 19:7
CROSS [1] - 32:9
CROSS-EXAMINATION [1] - 32:9
CSR [2] - 1:12, 34:22
current [1] - 30:6

**D**

daily [1] - 30:11
date [5] - 7:12, 7:16, 9:3, 13:5, 15:18
dated [2] - 8:3, 8:4
Davis [2] - 2:4, 32:16
DAVIS [25] - 1:15, 4:2, 5:16, 5:18, 7:9, 7:11, 8:11, 8:15, 8:17, 9:11, 9:23, 10:20, 16:15, 16:19, 17:1, 17:3, 19:9, 20:16, 21:19, 21:21, 26:9, 27:21, 27:23, 28:6, 32:8
Dean [1] - 24:17
deans [1] - 24:22
December [5] - 1:11, 3:5, 34:7, 34:19, 35:4
Defendant [2] - 1:22, 3:2
Defendants [1] - 1:7
definition [1] - 31:10
demarcation [1] - 27:1
department [6] - 4:9, 21:18, 24:22, 25:10, 27:9, 32:17
Department [4] - 24:18, 25:5, 29:19, 30:1
deponent [3] - 3:15, 34:14, 35:3
deposed [1] - 3:18
DEPOSITION [1] -

1:9
Deposition [2] - 2:10, 33:10
deposition [7] - 1:10, 3:3, 3:8, 3:13, 34:15, 35:3, 35:4
describe [2] - 12:22, 26:4
described [1] - 33:6
describes [2] - 11:11, 11:12
designed [1] - 30:14
details [1] - 19:23
detective [2] - 30:2, 30:7
different [1] - 14:8
differentiating [1] - 10:11
direct [1] - 30:18
Directing [1] - 33:2
directly [2] - 14:14, 30:10
directory [1] - 29:5
discovered [1] - 12:2
discovery [3] - 8:4, 16:10, 18:3
discuss [1] - 32:1
discussed [1] - 25:11
discussion [4] - 13:12, 13:14, 13:15, 16:20
Discussion [1] - 26:17
dispute [1] - 21:23
DISTRICT [2] - 1:1, 1:1
Diversity [1] - 9:21, 10:1, 21:5
DIVISION [1] - 1:2
DO [1] - 34:5
document [8] - 11:4, 11:6, 11:15, 15:19, 16:5, 18:2, 23:3, 25:14
documents [10] - 8:7, 8:18, 8:20, 12:8, 12:11, 12:19, 13:2, 14:1, 15:8, 16:20
domestic [1] - 21:23
DONALD [1] - 1:9
Donald [7] - 1:10, 3:3, 3:16, 4:5, 34:8, 35:3, 35:6
done [4] - 11:12, 14:3, 20:14, 32:8
Dr [2] - 14:7, 21:13, 31:5, 31:15, 31:18
duly [2] - 34:9, 35:3
during [2] - 6:6,

32:16

**E**

early [1] - 28:20
ears [1] - 22:9
effect [1] - 3:9
either [3] - 19:23, 25:12, 31:5
element [1] - 18:22
employed [1] - 4:13
employment [2] - 18:22, 28:16
end [5] - 9:14, 17:10, 28:19, 29:17
entered [1] - 30:8
entire [1] - 17:6
entity [1] - 15:11
essentially [1] - 29:11
et [1] - 35:2
events [1] - 29:21
eventually [1] - 6:21
evidence [2] - 30:8, 30:10
exactly [1] - 13:8
EXAMINATION [3] - 2:3, 4:1, 32:9
examination [1] - 34:12
examined [2] - 3:17, 34:11
example [4] - 21:20, 26:12, 31:15, 32:3
Excuse [1] - 17:1
Exhibit [12] - 5:16, 5:20, 8:12, 9:12, 9:14, 10:6, 10:16, 11:5, 12:9, 15:23, 18:6, 33:10
exhibit [3] - 8:14, 16:16, 17:4
Exhibits [2] - 2:10, 10:22
exhibits [2] - 2:11, 10:6
explain [1] - 18:18
eye [1] - 22:9

**F**

faced [1] - 33:4
faculty [17] - 5:10, 23:10, 23:16, 24:2, 24:4, 24:13, 24:21, 25:1, 26:1, 26:15, 26:21, 31:5, 31:11, 32:2, 32:19

Faculty [1] - 31:9
fair [2] - 7:18, 25:21
familiar [2] - 5:22, 30:12
far [2] - 12:21, 34:11
fashion [1] - 7:1
Federal [2] - 3:4, 3:9
female [4] - 13:8, 13:11, 22:22, 26:17
few [6] - 11:9, 13:22, 14:7, 16:7, 16:8, 21:11
file [8] - 6:15, 7:17, 16:9, 17:12, 30:9, 30:14, 30:15, 32:13
fine [1] - 16:18
First [1] - 18:6
first [9] - 6:6, 7:1, 7:12, 7:15, 11:9, 13:4, 28:12, 34:9, 35:3
folks [1] - 31:19
follow [2] - 25:5, 32:18
following [1] - 20:9
follows [1] - 3:18
FOR [1] - 1:1
Forbes [21] - 5:10, 6:20, 7:10, 13:11, 14:7, 14:9, 15:2, 15:7, 17:17, 19:2, 19:3, 19:12, 19:18, 21:13, 22:6, 22:19, 23:2, 24:19, 29:21, 31:6, 35:2
FORBES [1] - 1:6
Forbes' [1] - 22:22
force [3] - 3:8, 20:19, 23:9
foregoing [1] - 35:4
formal [1] - 25:6
forming [1] - 18:16
forth [1] - 21:9
forums [1] - 24:11
forward [1] - 13:20
foundation [3] - 19:6, 20:11, 21:15
foundational [1] - 7:7
frankly [1] - 30:13
friend [2] - 13:8, 13:11
full [1] - 4:3
function [1] - 6:14
funneled [1] - 27:9, 30:22
FURTHER [1] - 3:11
future [1] - 28:17

## G

**gathered** [1] - 31:7
**Gehrand** [9] - 4:18, 4:23, 6:12, 19:20, 20:5, 20:8, 20:23, 21:4, 29:22
**general** [1] - 22:16
**General** [1] - 1:20
**generally** [2] - 12:22, 13:1
**Generally** [1] - 13:21
**generated** [3] - 9:19, 10:7, 10:23
**given** [4] - 6:13, 11:2, 13:13, 21:3
**Goodfield** [1] - 29:3
**Group** [1] - 12:9
**group** [3] - 8:6, 12:8, 16:20
**guess** [3] - 24:17, 25:9, 25:20

## H

**hand** [8] - 8:6, 10:15, 11:4, 12:8, 16:19, 18:5, 34:18, 35:8
**handling** [1] - 30:10
**handwriting** [1] - 12:18
**harassed** [3] - 23:12, 23:16, 23:19
**harassment** [4] - 21:7, 24:3, 24:14, 27:7
**Head** [1] - 24:18
**heightened** [7] - 21:12, 21:17, 22:8, 22:21, 23:2, 24:3, 25:18
**hereby** [1] - 3:13
**HEREBY** [1] - 34:5
**hereunto** [2] - 34:17, 35:8
**herewith** [1] - 34:16
**higher** [1] - 24:21
**higher-ranking** [1] - 24:21
**hmm** [1] - 32:22
**hold** [1] - 4:15
**Holly** [3] - 1:12, 3:6, 34:4
**HOLLY** [1] - 34:21
**home** [1] - 29:6
**honorific** [1] - 28:15
**house** [2] - 21:23, 22:1

**Hunt** [6] - 7:10, 13:7, 14:7, 14:16, 15:2, 35:1
**HUNT** [1] - 1:3
**Hunt's** [1] - 28:12

## I

**idea** [1] - 4:21
**IDENTIFICATION** [1] - 2:9
**identification** [1] - 33:11
**identified** [5] - 5:20, 10:16, 11:5, 12:9, 17:4
**identify** [2] - 16:16, 18:6
**IL** [2] - 1:17, 1:21
**ILLINOIS** [3] - 1:1, 1:6, 34:1
**Illinois** [15] - 1:11, 1:13, 3:5, 3:6, 4:7, 15:11, 16:4, 20:2, 20:4, 20:7, 28:16, 29:3, 34:8
**implementing** [1] - 25:15
**IN** [3] - 1:1, 34:17, 35:8
**in-person** [1] - 14:6
**inaccurate** [1] - 18:15
**inaccurately** [1] - 7:15
**inappropriately** [1] - 26:15
**incidences** [1] - 23:10
**incidentally** [1] - 19:22
**including** [1] - 15:8
**increased** [1] - 25:13
**independent** [2] - 17:15, 17:16
**indicted** [2] - 6:21, 14:9
**inform** [1] - 24:22
**informal** [2] - 25:23, 32:19, 33:5
**informally** [1] - 25:11
**information** [8] - 6:16, 13:17, 15:4, 20:19, 21:4, 25:11, 27:5
**initial** [4] - 11:10, 11:11, 13:6, 13:19
**inside** [1] - 25:5
**insight** [1] - 13:17

**inspections** [1] - 13:2
**instance** [1] - 1:10, 33:4
**instructions** [1] - 24:19
**intend** [1] - 28:18
**intercede** [1] - 21:2
**interest** [1] - 11:21
**interview** [4] - 11:12, 13:20, 17:22, 30:3
**interviewed** [3] - 11:13, 13:22
**interviews** [4] - 10:12, 13:1, 14:8, 14:12
**investigate** [2] - 21:7, 26:22
**investigating** [2] - 6:20, 27:10
**investigation** [10] - 5:1, 6:7, 6:22, 10:4, 12:23, 28:8, 29:20, 30:12, 31:16, 32:2
**investigations** [3] - 6:9, 14:3, 16:6
**involve** [1] - 20:3
**involved** [7] - 7:1, 14:14, 14:18, 14:21, 26:16, 27:9, 28:8
**involvement** [4] - 7:13, 11:2, 11:11, 30:18
**involving** [6] - 5:9, 7:10, 14:15, 19:4, 20:20, 29:21
**IS** [2] - 3:1, 3:11
**issuance** [1] - 3:7
**issues** [1] - 5:11
**ISU** [19] - 4:10, 4:11, 4:15, 4:22, 11:10, 16:8, 19:4, 20:21, 21:1, 21:17, 23:3, 23:9, 24:4, 24:12, 24:22, 25:5, 25:22, 29:19, 30:13
**IT** [2] - 3:1, 3:11

## J

**Janssen** [1] - 1:16
**job** [2] - 18:10, 18:17
**Julie** [3] - 30:7, 30:19, 32:12
**June** [1] - 28:20

## K

**K-N-A-P-P** [1] - 4:5

**keep** [3] - 22:9, 24:12
**Keith** [2] - 4:18, 4:23
**KERLEY** [20] - 1:19, 5:14, 7:6, 8:9, 8:13, 9:9, 9:21, 10:17, 16:12, 16:18, 16:22, 19:5, 20:10, 21:15, 26:5, 27:19, 27:22, 28:3, 32:10, 33:8
**Kerley** [1] - 2:5
**kind** [1] - 33:4
**KNAPP** [1] - 1:9
**Knapp** [8] - 1:10, 3:3, 3:16, 4:5, 5:14, 34:9, 35:3, 35:6
**knowledge** [5] - 22:4, 24:12, 29:19, 29:20, 34:10

## L

**labeled** [1] - 7:15
**lack** [3] - 20:11, 22:20, 26:16
**last** [5] - 4:4, 8:13, 13:9, 18:9, 30:5
**late** [1] - 28:20
**Law** [3] - 1:16, 1:16, 1:20
**least** [3] - 27:4, 30:3
**left** [1] - 29:23
**legal** [2] - 31:21, 31:22
**lengthy** [1] - 11:15
**less** [1] - 25:19
**letter** [9] - 5:19, 5:23, 6:3, 6:5, 6:6, 6:17, 6:19, 19:20, 19:21
**light** [1] - 15:7
**likely** [1] - 22:3
**line** [2] - 27:1, 33:2
**listener** [1] - 14:22
**lived** [1] - 29:9
**look** [6] - 5:20, 11:6, 11:14, 12:11, 17:2, 18:6
**looked** [1] - 32:14
**looking** [3] - 20:17, 24:6, 31:13
**looks** [1] - 17:17
**lost** [1] - 17:12

## M

**Main** [1] - 1:17
**Major** [5] - 24:17, 24:18, 31:5, 31:15, 31:18

**man** [2] - 17:19, 17:21
**mark** [1] - 9:13
**marked** [1] - 33:11
**marking** [1] - 8:9
**material** [2] - 10:11, 10:23
**materials** [7] - 9:15, 9:18, 9:19, 10:3, 10:7, 10:9, 11:1
**matter** [4] - 5:9, 6:20, 20:2, 34:10
**McCreary** [7] - 6:12, 13:7, 13:14, 13:19, 13:23, 26:23, 31:23
**McCreary's** [6] - 10:2, 10:8, 10:23, 13:6, 27:12, 27:14
**McLean** [1] - 15:15
**mean** [5] - 13:1, 19:7, 21:17, 21:20, 31:11
**meant** [1] - 18:18
**meeting** [1] - 14:6
**meetings** [2] - 31:4, 31:7
**Megan** [9] - 7:10, 13:7, 13:13, 13:15, 14:7, 14:16, 15:2, 28:12, 35:1
**MEGAN** [1] - 1:3
**Megan's** [1] - 13:8
**member** [9] - 5:10, 24:3, 24:4, 24:13, 26:1, 26:15, 26:21, 31:11, 32:19
**member's** [1] - 24:13
**members** [4] - 24:22, 25:1, 25:10, 31:5, 31:9, 32:2
**memory** [2] - 17:9, 23:1
**mentioned** [1] - 12:1
**met** [3] - 13:6, 17:19, 17:21
**MICHAEL** [1] - 1:6
**Michael** [16] - 5:10, 7:10, 13:1, 15:2, 17:17, 19:2, 19:3, 19:17, 22:6, 22:19, 22:21, 23:2, 24:19, 29:21, 31:6, 35:2
**might** [2] - 32:3, 32:17
**Minnesota** [2] - 19:17, 21:3
**minute** [2] - 10:18, 12:1
**misconduct** [3] - 18:21, 19:3, 19:12

missing [1] - 17:9
moment [1] - 26:14
monitoring [1] - 14:18
months [1] - 14:10
most [1] - 30:12
MR [25] - 1:15, 4:2, 5:16, 5:18, 7:9, 7:11, 8:11, 8:15, 8:17, 9:11, 9:23, 10:20, 16:15, 16:19, 17:1, 17:3, 19:9, 20:16, 21:19, 21:21, 26:9, 27:21, 27:23, 28:6, 32:8
MS [20] - 1:19, 5:14, 7:6, 8:9, 8:13, 9:9, 9:21, 10:17, 16:12, 16:18, 16:22, 19:5, 20:10, 21:15, 26:5, 27:19, 27:22, 28:3, 32:10, 33:8
music [2] - 18:11, 18:17

# N

name [9] - 4:3, 4:4, 4:5, 4:17, 5:10, 13:9, 29:1, 30:2, 30:5
named [1] - 30:7
names [3] - 13:22, 23:8, 24:1
narrative [1] - 12:4
near [3] - 28:17, 28:19, 29:17
need [3] - 23:8, 24:1, 26:21
needs [1] - 26:23
never [3] - 12:19, 19:22, 33:4
newspaper [1] - 18:4
nexus [1] - 21:4
Nine [1] - 16:22
nine [1] - 16:22
Normal [4] - 1:11, 3:6, 4:7, 34:8
Nos [4] - 2:10, 10:7, 10:22, 33:10
Notarial [2] - 34:18, 35:8
Notary [5] - 1:12, 3:7, 34:4, 34:22, 35:10
notes [1] - 12:12
nothing [2] - 12:15, 25:6
notice [2] - 1:13, 3:7
notified [1] - 32:18
number [9] - 5:12,

8:5, 8:15, 11:10, 15:15, 17:5, 18:3, 29:7, 29:12
numbers [4] - 12:10, 16:17, 16:20, 17:5

# O

oath [1] - 35:3
Objection [3] - 19:5, 20:10, 21:15
objections [1] - 3:12
obtained [1] - 14:5
Obviously [1] - 12:12
occasions [2] - 24:21, 31:14
occupation [1] - 4:8
occurred [7] - 5:12, 5:13, 9:10, 10:19, 16:14, 26:8, 33:5
ODAA [3] - 14:3, 16:6, 27:2
OF [4] - 1:1, 1:9, 34:1, 34:2
offense [1] - 18:22
office [8] - 10:2, 10:8, 11:1, 13:6, 13:19, 27:13, 27:14, 34:7
Office [2] - 6:8, 9:19
officer [2] - 11:13, 30:15
offices [1] - 1:11
official [5] - 6:18, 18:21, 31:4, 31:6, 31:14
once [2] - 17:20, 17:21
one [13] - 9:3, 11:13, 14:21, 15:14, 15:21, 15:22, 18:21, 21:14, 25:10, 25:12, 26:13, 27:4, 30:3
open [1] - 22:10
options [2] - 13:14, 13:18
order [1] - 14:5
organization [1] - 4:22
Otherwise [1] - 26:22
outlined [1] - 14:2
outset [1] - 11:2
outside [2] - 15:11, 16:3
own [1] - 29:20

# P

p.m [1] - 1:11
packet [5] - 8:23, 9:6, 9:13, 9:14, 16:5
page [4] - 8:13, 17:10, 17:12, 28:1
pages [2] - 11:9, 12:10
paid [1] - 23:2
Pantagraph [1] - 18:5
paragraph [1] - 18:9
part [4] - 3:12, 6:9, 11:15, 27:10
parties [1] - 24:20
passed [3] - 19:21, 21:5, 25:19
passes [1] - 26:16
past [1] - 12:3
patrol [1] - 5:1
PD [1] - 21:17
pen [1] - 16:3
people [3] - 11:13, 13:22, 25:12
PEORIA [1] - 1:2
Peoria [1] - 1:17
percent [1] - 17:9
performance [2] - 18:10, 18:17
performed [1] - 12:23
perhaps [3] - 13:12, 13:17, 21:16
person [2] - 14:6, 29:23, 30:10
personally [2] - 23:13, 27:5
persons [1] - 29:19
Peters [1] - 22:5
PG [2] - 2:3, 2:9
phone [6] - 14:6, 29:4, 29:6, 29:7, 31:15
picked [1] - 31:15
places [1] - 24:1
Plaintiff [6] - 1:4, 1:10, 1:18, 3:2, 3:5, 3:17
Plaintiff's [1] - 5:20
plans [2] - 28:16, 29:14
plus [5] - 9:18, 10:7, 10:23, 16:5, 16:7
point [4] - 11:21, 13:20, 18:20
police [26] - 4:9, 4:22, 5:2, 5:3, 11:10, 13:6, 13:21, 15:8,

15:10, 15:14, 16:8, 20:2, 20:4, 20:19, 21:1, 21:18, 21:22, 23:3, 23:9, 24:4, 24:12, 24:23, 25:10, 27:8, 30:13, 33:5
Police [4] - 22:6, 25:5, 29:19, 30:1
position [3] - 4:14, 5:5, 5:7
positions [1] - 31:20
potential [1] - 14:9
practice [1] - 20:2
practices [1] - 20:4
preparation [1] - 14:12
prepare [2] - 8:20, 15:10
present [1] - 18:1
president [1] - 31:21
pretty [2] - 26:19, 31:9
previous [1] - 6:9
previously [5] - 5:19, 10:16, 11:5, 12:9, 14:3
priorly [1] - 19:2
privacy [2] - 23:7, 26:2
problems [1] - 26:7
procedure [6] - 20:17, 20:18, 22:13, 25:5, 32:17, 32:20
Procedure [1] - 3:4
procedures [1] - 25:3
process [3] - 25:15, 25:23, 33:5
processes [1] - 15:6
produced [4] - 3:16, 8:4, 16:10, 18:3
Professor [1] - 19:12
professor [2] - 20:7, 20:21
professors [1] - 23:15
proper [2] - 20:23, 25:8
provide [1] - 8:3
provided [6] - 6:8, 9:7, 9:15, 10:9, 14:1, 15:15, 16:3, 17:7
providing [3] - 13:17, 13:18
Public [5] - 1:12, 3:7, 34:4, 34:22, 35:10
purposes [2] - 7:7, 12:10, 19:6
pursuant [1] - 1:13, 3:3, 34:6

put [3] - 5:16, 17:15, 18:2

# Q

qualifier [1] - 23:4
questioning [1] - 33:3
questions [4] - 23:6, 32:16, 32:21, 33:9
quick [1] - 16:13
quite [1] - 20:13
quotes [1] - 18:10

# R

raised [1] - 3:13
RALPH [1] - 1:15
ranking [1] - 24:21
Rather [1] - 11:20
rather [1] - 17:5
read [3] - 30:15, 35:4
reading [1] - 6:2
real [1] - 16:12
realize [1] - 27:16
really [4] - 17:18, 19:22, 31:11, 33:3
reason [1] - 18:15
received [4] - 6:16, 8:23, 10:3, 20:19
recognize [9] - 5:23, 8:18, 11:6, 11:8, 12:13, 12:15, 12:16, 12:18, 17:6
recollection [5] - 6:2, 7:2, 17:17, 25:23, 32:6
recommendation [1] - 28:15
record [11] - 5:13, 7:8, 9:9, 9:10, 10:17, 10:19, 16:12, 16:14, 20:22, 25:9, 26:8
recording [1] - 25:15
redact [1] - 28:21
reference [1] - 8:2
referring [3] - 15:21, 15:22, 27:17
regarding [1] - 24:20
remember [8] - 7:12, 15:17, 18:12, 18:14, 24:15, 24:16, 26:18, 27:4
report [14] - 7:15, 8:2, 8:3, 11:10, 11:15, 11:17, 11:22, 12:5, 13:6, 15:14, 16:8, 17:6, 25:13, 26:22

reported [1] - 5:2
**Reporter** [1] - 1:12
**reporter** [3] - 2:11, 18:9, 18:13
**reporting** [1] - 13:21
**reports** [5] - 15:8, 15:10, 15:13, 31:7, 32:12
**request** [1] - 14:10
**requested** [1] - 24:11
**reserved** [1] - 3:13
**reside** [1] - 29:2
**residential** [1] - 28:23
**respect** [6] - 20:8, 22:22, 24:14, 26:1, 28:16, 32:11
**respond** [1] - 22:4
**responded** [1] - 32:19
**responsibilities** [1] - 20:8
**responsibility** [1] - 21:1
**rest** [1] - 19:23
**restrict** [1] - 30:14
**restrictions** [2] - 24:23, 32:18
**result** [2] - 9:18, 25:12
**retained** [1] - 2:11
**retire** [1] - 28:18
**retired** [1] - 4:20
**returned** [1] - 34:16
**review** [1] - 11:17
**Richter** [1] - 13:9
**rights** [1] - 26:2
**role** [1] - 13:16
**Ron** [1] - 5:4
**Ronald** [2] - 5:4, 5:5
**Rules** [2] - 3:4, 3:9
**run** [1] - 26:6

## S

**sanction** [1] - 31:14
**SARAH** [1] - 1:19
**sat** [1] - 17:20
**saw** [5] - 6:6, 6:19, 6:21, 17:19, 19:22
**SCHMID** [1] - 34:21
**Schmid** [3] - 1:12, 34:4, 35:12
**school** [1] - 20:20
**scratch** [1] - 14:15, 23:11
**scrutiny** [2] - 24:4, 25:18
**Seal** [3] - 34:18,

35:8, 35:10
**second** [1] - 18:9
**Second** [1] - 1:21
**see** [5] - 6:11, 7:17, 25:9, 26:12, 29:17
**semester** [1] - 28:19
**sense** [2] - 4:21, 22:8
**sensitive** [1] - 22:2
**sensitivity** [4] - 21:12, 21:17, 22:8, 22:21
**sent** [1] - 19:20
**September** [1] - 4:14
**set** [3] - 14:10, 34:17, 35:8
**several** [1] - 25:12
**sexual** [3] - 21:7, 24:3, 27:7
**sexually** [2] - 23:11, 26:16
**Sexually** [2] - 23:18, 23:19
**Shane** [8] - 6:12, 10:8, 10:23, 13:6, 26:23, 27:12, 27:14, 31:23
**Sheppelman** [3] - 30:7, 30:19, 32:12
**SHEPPELMAN** [1] - 30:7
**Shorthand** [1] - 1:12
**shorthand** [1] - 34:12
**show** [1] - 5:19
**side** [1] - 21:8
**signature** [3] - 3:14, 34:14, 35:5
**signed** [1] - 34:14
**sit** [7] - 11:23, 12:6, 17:14, 18:18, 29:18, 32:2, 32:6
**situation** [2] - 25:9, 26:14
**Smiths** [1] - 22:1
**so..** [1] - 27:18
**sometime** [1] - 28:18
**somewhere** [1] - 12:3
**soon** [1] - 9:1
**Soon** [1] - 9:2
**sorry** [1] - 7:6
**sort** [2] - 22:9, 25:18
**sources** [1] - 16:3
**South** [1] - 1:21
**speaking** [1] - 13:21
**special** [4] - 15:10, 16:15, 24:6, 24:19
**specific** [3] - 6:17, 27:3, 32:5
**Specifically** [1] -

31:18
**specifically** [1] - 22:19
**speculation** [2] - 20:10, 33:3
**spell** [2] - 4:3, 30:5
**spending** [1] - 12:22
**spring** [1] - 28:19
**Springfield** [1] - 1:21
**St** [1] - 22:5
**ST** [1] - 34:2
**stack** [1] - 14:1
**stamp** [1] - 32:13
**standpoint** [1] - 22:17
**start** [1] - 5:11
**started** [1] - 13:21
**starting** [1] - 8:5
**state** [4] - 4:3, 20:6, 20:20, 29:2
**STATE** [2] - 1:6, 34:1
**State** [11] - 1:11, 1:12, 3:5, 15:11, 16:4, 20:3, 20:5, 20:7, 28:16, 34:8, 35:6
**State's** [1] - 15:16
**state's** [3] - 14:5, 14:11, 17:7
**statement** [1] - 18:16
**STATES** [1] - 1:1
**still** [1] - 5:5
**STIPULATED** [2] - 3:1, 3:11
**story** [2] - 13:13, 20:1
**Street** [2] - 1:17, 1:21
**street** [1] - 29:1
**structure** [1] - 4:22
**student** [7] - 13:8, 13:11, 18:11, 20:6, 20:20, 23:12, 26:17
**students** [5] - 22:23, 23:17, 23:19, 24:14, 24:20
**substance** [1] - 19:19
**supervision** [1] - 30:21
**supplements** [1] - 16:8
**support** [1] - 20:15
**surreptitious** [1] - 14:6
**Sutton** [1] - 3:6
**Swan** [3] - 5:4, 5:5
**sworn** [3] - 3:16, 34:9, 35:3
**system** [1] - 30:14

## T

**tasked** [1] - 27:10
**teach** [1] - 31:10
**teacher** [2] - 18:11, 18:17
**telephone** [1] - 29:12
**term** [2] - 22:21, 25:8
**testified** [2] - 3:17, 24:18
**testify** [1] - 34:9
**testimony** [2] - 10:12, 15:7
**THE** [5] - 1:1, 1:1, 8:16, 20:12, 28:5
**thereabouts** [1] - 19:16
**thereafter** [2] - 9:1, 9:2
**thinking** [1] - 18:23
**tied** [1] - 18:22
**ties** [1] - 21:8
**Timothy** [3] - 30:2, 30:19, 32:12
**today** [11] - 11:18, 11:23, 12:6, 12:21, 15:5, 17:14, 18:18, 29:18, 32:1, 32:3, 32:6
**together** [2] - 8:8, 17:15
**took** [1] - 27:16
**Torkelson** [3] - 19:17, 21:14, 22:6
**torn** [2] - 16:11, 18:2
**touching** [1] - 34:10
**town** [2] - 29:1, 29:5
**transcribed** [1] - 34:13
**transcript** [1] - 35:4
**tread** [1] - 26:2
**trial** [4] - 3:14, 14:9, 14:12, 14:13
**truth** [1] - 34:10
**two** [4] - 13:5, 14:2, 16:6, 17:12
**type** [1] - 32:20
**typewriter** [1] - 34:13

## U

**undated** [1] - 18:4
**under** [3] - 16:3, 25:18, 30:20
**underlying** [1] - 27:8
**UNITED** [1] - 1:1
**university** [7] - 20:6, 21:3, 21:6, 21:9,

24:11, 27:10, 31:19
**UNIVERSITY** [1] - 1:6
**University** [7] - 1:11, 3:6, 15:11, 16:4, 20:7, 28:17, 34:8
**Unless** [1] - 17:12
**unofficial** [1] - 25:8
**unreported** [1] - 25:9
**up** [3] - 16:11, 20:9, 31:15

## V

**various** [3] - 14:8, 15:5, 15:6
**violate** [1] - 23:7
**vs** [2] - 1:5, 35:1

## W

**waived** [3] - 3:7, 3:15, 34:15
**watch** [1] - 24:12
**water** [2] - 25:20, 32:20
**wearing** [1] - 14:16
**weeks** [1] - 14:10
**whereabouts** [1] - 21:13
**WHEREOF** [2] - 34:17, 35:8
**whole** [1] - 34:10
**Williamson** [1] - 34:5
**wing** [1] - 21:6
**wire** [1] - 14:16
**witness** [2] - 1:10, 10:12
**WITNESS** [5] - 8:16, 20:12, 28:5, 34:17, 35:8
**witnesses** [1] - 14:9
**word** [2] - 19:6, 26:17
**words** [1] - 22:7
**works** [1] - 30:10
**wrote** [2] - 7:16, 30:3

## Y

**year** [1] - 9:5
**years** [2] - 4:12, 29:10
**yourself** [1] - 29:22